**L.L. BEAN, INC., Plaintiff, Appellee,**

**v.**

**DRAKE PUBLISHERS, INC., et al., Defendants, Appellants.**

No. 86–1202, No. 86–1203.

United States Court of Appeals, First Circuit.

Argued Sept. 12, 1986.

Decided Feb. 10, 1987.

As Amended Feb. 12, 1987.

Norman S. Beier with whom Lawrence E. Abelman, Abelman, Frayne, Rezac & Schwab, New York City, Elliott L. Epstein, Robert S. Hark and Isaacson, Hark & Epstein, Lewiston, Me., were on brief, for defendants, appellants.

George S. Isaacson with whom Alfred C. Frawley and Brann & Isaacson, Lewiston, Me., were on brief, for plaintiff, appellee.

Before CAMPBELL, Chief Judge,
COFFIN and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

Imitation may be the highest form of flattery, but plaintiff-appellee L.L. Bean, Inc., was neither flattered nor amused when *High Society* magazine published a prurient parody of Bean's famous catalog. Defendant-appellant Drake Publishers, Inc., owns *High Society*, a monthly periodical featuring adult erotic entertainment. Its October 1984 issue contained a two-page article entitled "L.L. Bea*m*'s Back-To-School-Sex-Catalog." (Emphasis added.) The article was labelled on the magazine's contents page as "humor" and "parody." The article displayed a facsimile of Bean's trademark and featured pictures of nude models in sexually explicit positions using "products" that were described in a crudely humorous fashion.

L.L. Bean sought a temporary restraining order to remove the October 1984 issue from circulation. The complaint alleged trademark infringement, unfair competition, trademark dilution, deceptive trade practices, interference with prospective business advantage and trade libel. The United States District Court for the District of Maine denied Bean's request for a temporary restraining order. Thereafter,

both parties sought summary judgment. The district court granted summary judgment in favor of Drake on the claims for trade libel and interference with prospective business advantage. It denied summary judgment to both parties on Bean's claims for trademark infringement, unfair competition and deceptive trade practices, leaving the factual question of "likelihood of confusion" for resolution at trial. *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 625 F.Supp. 1531 (D.Me.1986).

The district court did, however, grant Bean summary judgment with respect to the trademark dilution claim raised under Maine law. Me.Rev.Stat.Ann. tit. 10, § 1530 (1981).[1] It ruled that the article had tarnished Bean's trademark by undermining the goodwill and reputation associated with the mark. Relying on two affidavits presented by appellee, the district court found that Bean had suffered harm from the publication of the article. The court rejected Drake's claim that the Maine statute did not encompass allegations of tarnishment caused by parody. The court also held that enjoining the publication of a parody to prevent trademark dilution did not offend the first amendment. An injunction issued prohibiting further publication or distribution of the "L.L. Beam Sex Catalog." *L.L. Bean v. Drake Publishers*, 625 F.Supp. at 1530. After its motion for reconsideration was denied, Drake appealed the order enjoining further publication of the Sex Catalog.

Since there are no Maine cases delineating the scope of the Maine anti-dilution statute, we do not, at this time, review the district court's ruling on the reach of the statute. Because we think it would be inappropriate for us to construe the statute in the first instance, we shall confine our review to whether the injunction offends the first amendment.

In reviewing an appeal from an entry of summary judgment, the record must be

---

1. Maine's anti-dilution statute provides:
 Likelihood of injury to business reputation or of dilution of a mark registered under this chapter ... shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of the goods or services.

viewed in the light most favorable to the party opposing the motion. *King v. Williams Industries, Inc.*, 724 F.2d 240, 241 (1st Cir.), *cert. denied*, 466 U.S. 980, 104 S.Ct. 2363, 80 L.Ed.2d 835 (1984); *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). Where, as here, both parties have moved for summary judgment, a court separately evaluates the two motions, in each instance drawing factual inferences most favorable to the opposing party. 10A C. Wright, A. Miller & M.K. Kane, *Federal Practice and Procedure* § 2720, at 23–24 (2d ed. 1983). Since the district court rejected defendant's position that a trademark parody constituted a defense to a claim based on the anti-dilution statute, we assume, as we must for purposes of this appeal, that the article is a trademark parody.

### I.

Parody is a humorous form of social commentary and literary criticism that dates back as far as Greek antiquity. "The rhapsodists who strolled from town to town to chant the poems of Homer," wrote Issac D'Israeli, "were immediately followed by another set of strollers—buffoons who made the audiences merry by the burlesque turn which they gave to the solemn strains." I. D'Israeli, *Curiosities of Literature, quoted in* D. MacDonald, *Parodies: An Anthology from Chaucer to Beerbohm—and After* 562 (1960). The Oxford English Dictionary defines parody as "[a] composition in which the characteristic turns of thought and phrase of an author are mimicked to appear ridiculous, especially by applying them to ludicrously inappropriate subjects." Chaucer, Shakespeare, Pope, Voltaire, Fielding, Hemingway and Faulkner are among the myriad of authors who have written parodies. Since parody seeks to ridicule sacred verities and prevailing mores, it inevitably offends others, as evinced by the shock which Chaucer's *Canterbury Tales* and Voltaire's *Candide* provoked among their contemporaries.

A trademark is a word, name or symbol adopted and used by a manufacturer or merchant to identify goods and distinguish them from those manufactured by others. 15 U.S.C. § 1127 (1985 Supp.). One need only open a magazine or turn on television to witness the pervasive influence of trademarks in advertising and commerce. Designer labels appear on goods ranging from handbags to chocolates to every possible form of clothing. Commercial advertising slogans, which can be registered as trademarks, have become part of national political campaigns. "Thus, trademarks have become a natural target of satirists who seek to comment on this integral part of the national culture." Dorsen, *Satiric Appropriation and the Law of Libel, Trademark and Copyright: Remedies Without Wrongs*, 65 B.U.L.Rev. 923, 939 (1986); Note, *Trademark Parody: A Fair Use and First Amendment Analysis*, 72 Va.L. Rev. 1079 (1986).

The ridicule conveyed by parody inevitably conflicts with one of the underlying purposes of the Maine anti-dilution statute, which is to protect against the tarnishment of the goodwill and reputation associated with a particular trademark. *Pignons, S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 494–95 (1st Cir. 1981). The court below invoked this purpose as the basis for its decision to issue an injunction. The issue before us is whether enjoining the publication of appellant's parody violates the first amendment guarantees of freedom of expression.

### II.

The district court disposed of the first amendment concerns raised in this matter by relying on the approach taken in *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200 (2d Cir.1979). In rejecting Drake's claim that the first amendment protects the unauthorized use of another's trademark in the process of conveying a message, the district court cited the following language from *Dallas Cowboys Cheerleaders*:

"Plaintiff's trademark is in the nature of a property right, ... and as such it need not 'yield to the exercise of First Amendment rights under circumstances where adequate alternative avenues of communication exist.' *Lloyd Corp. v. Tanner,* 407 U.S. 551 [92 S.Ct. 2219, 33 L.Ed.2d 131] (1972)."

*L.L. Bean v. Drake,* 625 F.Supp. at 1537 (quoting *Dallas Cowboys Cheerleaders,* 604 F.2d at 206).

We do not believe that the first amendment concerns raised here can be resolved as easily as was done in *Dallas Cowboys Cheerleaders.* *Cf.* Dorsen, *Satiric Appropriation,* 65 B.U.L.Rev. at 951; Denicola, *Trademarks As Speech: Constitutional Implications of the Emerging Rationales for the Protection of Trade Symbols,* 1982 Wis.L.Rev. 158, 206 ("the sweeping rejection of the defendant's first amendment claim in *Dallas Cowboys Cheerleaders* is dangerously simplistic."). Aside from our doubts about whether there are alternative means of parodying plaintiff's catalog, we do not think the court fully assessed the nature of a trademark owner's property rights. A trademark is a form of intellectual property; the Supreme Court case, *Lloyd Corp. v. Tanner,* 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972), relied upon by the *Dallas Cowboys Cheerleaders* court involved a shopping center. The first amendment issues involved in this case cannot be disposed of by equating the rights of a trademark owner with the rights of an owner of real property:

> *[T]rademark is not property in the ordinary sense* but only a word or symbol indicating the origin of a commercial product. The owner of the mark acquires the right to prevent the goods to which the mark is applied from being confused with those of others and to prevent his own trade from being diverted to competitors through their use of misleading marks.

*Power Test Petroleum Distributors v. Calcu Gas,* 754 F.2d 91, 97 (2d Cir.1985) (emphasis added) (quoting *Industrial Rayon Corp. v. Dutchess Underwear Corp.,* 92 F.2d 33, 35 (2d Cir.1937), *cert. denied,* 303 U.S. 640, 58 S.Ct. 610, 82 L.Ed. 1100 (1938)). *Accord Dresser Industries, Inc. v. Heraeus Engelhard Vacuum, Inc.,* 395 F.2d 457 (3d Cir.), *cert. denied,* 393 U.S. 934, 89 S.Ct. 293, 21 L.Ed.2d 270 (1968); *Lucasfilm Ltd. v. High Frontier,* 622 F.Supp. 931 (D.D.C.1985).

The limits on the scope of a trademark owner's property rights was considered recently in *Lucasfilm Ltd. v. High Frontier, supra.* In that case, the owners of the trademark "Star Wars" alleged injury from public interest groups that used the term in commercial advertisements presenting their views on President Reagan's Strategic Defense Initiative. Judge Gesell stressed that the sweep of a trademark owner's rights extends only to injurious, unauthorized *commercial uses* of the mark by another. 622 F.Supp. at 933–35. Trademark rights do not entitle the owner to quash an unauthorized use of the mark by another who is communicating ideas or expressing points of view. *Id.* As Justice Holmes observed while sitting on the Supreme Judicial Court of Massachusetts, "When the common law developed the doctrine of trademarks and trade-names, it was not creating a property in advertisements more absolute than it would have allowed the author of *Paradise Lost.*" *Chadwick v. Covell,* 151 Mass. 190, 193, 23 N.E. 1068, 1069 (1890).

The limits imposed on a trademark owner's property rights demonstrate that the constitutional issue raised here cannot be dispensed with by simply asserting that Bean's property right need not yield to the exercise of first amendment rights. *L.L. Bean v. Drake,* 625 F.Supp. at 1537. We turn now to an examination of whether the Constitution prohibits the application of Maine's anti-dilution statute as construed by the district court to the instant case.

## III.

The concept of trademark dilution originated in England when a British court protected the trademark "Kodak" from being used on bicycles. Derenberg, *The Problem*

*of Trademark Dilution and Anti-Dilution Statutes,* 44 Calif.L.Rev. 439 (1956). Anti-dilution statutes have developed to fill a void left by the failure of trademark infringement law to curb the unauthorized use of marks where there is no likelihood of confusion between the original use and the infringing use. The law of trademark dilution aims to protect the distinctive quality of a trademark from deterioration caused by its use on dissimilar products. *Pro-phy-lac-tic Brush Co. v. Jordan Marsh,* 165 F.2d 549, 553 (1st Cir.1948); *Community Federal Sav. and Loan Ass'n v. Orondorff,* 678 F.2d 1034 (11th Cir.1982); *BiRite Enterprises, Inc. v. Button Master,* 555 F.Supp. 1188, 1196 (S.D.N.Y.1983); 2 J.T. McCarthy, *Trademarks and Unfair Competition* § 24.13 (1973). The dilution injury "is the gradual whittling away or dispersion of the identity and hold upon the public mind of the mark or name by its use on non-competing goods." Schechter, *The Rational Basis of Trademark Protection,* 40 Harv.L.Rev. 813, 825 (1927). The overriding purpose of anti-dilution statutes is to prohibit a merchant of noncompetitive goods from selling its products by trading on the goodwill and reputation of another's mark.

■ A trademark owner may obtain relief under an anti-dilution statute if his mark is distinctive and there is a likelihood of dilution due to (1) injury to the value of the mark caused by actual or potential confusion, (2) diminution in the uniqueness and individuality of the mark, or (3) injury resulting from use of the mark in a manner that tarnishes or appropriates the goodwill and reputation associated with plaintiff's mark. *Astra Pharmaceutical Prod. v. Beckman Instruments,* 718 F.2d 1201, 1209 (1st Cir.1983); *Pignons, S.A. de Mecanique de Precision v. Polaroid Corp.,* 657 F.2d at 494–95. There is no dispute that Bean's mark is distinctive. The basis for the district court's injunction was that Bean's trademark had been tarnished by the parody in defendant's magazine. We think this was a constitutionally impermissible application of the anti-dilution statute.

■ The district court believed that if a noncommercial parody "would result in images of impurity in the minds of [consumers] ... [s]uch connotations would obviously tarnish the affirmative associations the mark had come to convey." *L.L. Bean v. Drake Publishers,* 625 F.Supp. at 1536. It thus read the anti-dilution statute as granting a trademark owner the unfettered right to suppress the use of its name in any context, commercial or noncommercial, found to be offensive, negative or unwholesome.[2] As one commentator has pointed out, there are serious first amendment implications involved in applying anti-dilution statutes to cover noncommercial uses of a trademark:

> Famous trademarks offer a particularly powerful means of conjuring up the image of their owners, and thus become an important, perhaps at times indispensable, part of the public vocabulary.

---

2. The enforcement of such a right would entail state action. Note, *Trademark Parody,* 72 Va.L. Rev. at 1110; Denicola, *Trademarks As Speech,* 1982 Wis.L.Rev. at 190 n. 146; *but see Reddy Communications, Inc. v. Environmental Action Foundation,* 199 U.S.P.Q. (BNA) 630, 633–34 (D.D.C.1977). When judicial enforcement of private personal rights touching forms of communication restricts freedom of speech, state action is implicated. *New York Times v. Sullivan,* 376 U.S. 254, 265, 84 S.Ct. 710, 718, 11 L.Ed.2d 686 (1964). Nor does the state action doctrine limit the application of the first amendment when enforcement of intangible property rights would curtail communicative freedoms. *Zacchini v. Scripps-Howard Broadcasting,* 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977). In *Zacchini,* the performer of a "human cannonball" act claimed that his right of publicity had been appropriated by a media defendant that had broadcast his entire fifteen-second performance. The Court characterized plaintiff's right of publicity as "professional property." *Id.* at 569, 97 S.Ct. at 2854. Although the Court held that defendant was not privileged to broadcast plaintiff's *entire* act, it recognized that private enforcement of intangible property rights implicates first amendment concerns: "Wherever the line in particular situations is to be drawn between media reports that are protected and those that are not, we are quite sure that the First and Fourteenth Amendments do not immunize the media when they broadcast a performer's entire act without his consent." *Id.* at 574–75, 97 S.Ct. at 2856–57.

Rules restricting the use of well-known trademarks may therefore restrict the communication of ideas.... If the defendant's speech is particularly unflattering, it is also possible to argue that the trademark has been tarnished by the defendant's use. The constitutional implications of extending the misappropriation or tarnishment rationales to such cases, however, may often be intolerable. Since a trademark may frequently be the most effective means of focusing attention on the trademark owner or its product, the recognition of exclusive rights encompassing such use would permit the stifling of unwelcome discussion.

Denicola, *Trademarks As Speech*, 1982 Wis.L.Rev. at 195–96.

■ The district court's opinion suggests that tarnishment may be found when a trademark is used without authorization in a context which diminishes the positive associations with the mark. Neither the strictures of the first amendment nor the history and theory of anti-dilution law permit a finding of tarnishment based solely on the presence of an unwholesome or negative context in which a trademark is used without authorization. Such a reading of the anti-dilution statute unhinges it from its origins in the marketplace. A trademark is tarnished when consumer capacity to associate it with the appropriate products or services has been diminished. The threat of tarnishment arises when the goodwill and reputation of a plaintiff's trademark is linked to products which are of shoddy quality or which conjure associations that clash with the associations generated by the owner's lawful use of the mark:

> [T]he risk may be that of detracting from the plaintiff's good will by the possibility that a defendant's use of plaintiff's unique mark will tarnish plaintiff's trade name by reason of public dissatisfaction with defendant's *product* and a resultant holding of this dissatisfaction against plaintiff.
>
> An alternative to this ... risk is the danger of public identification of plaintiff's trade name or mark with a *product*

*or service* of a type incompatible with the quality and prestige previously attached by the public to the plaintiff's product.

*Tiffany & Co. v. Boston Club, Inc.*, 231 F.Supp. 836, 844 (D.Mass.1964) (emphasis added).

■ As indicated by Judge Caffrey in *Tiffany*, the dilution injury stems from an unauthorized effort to market incompatible products or services by trading on another's trademark. The Constitution is not offended when the anti-dilution statute is applied to prevent a defendant from using a trademark without permission in order to merchandise dissimilar products or services. Any residual effect on first amendment freedoms should be balanced against the need to fulfill the legitimate purpose of the anti-dilution statute. *See Friedman v. Rogers*, 440 U.S. 1, 15–16, 99 S.Ct. 887, 896–97, 59 L.Ed.2d 100 (1979). The law of trademark dilution has developed to combat an unauthorized and harmful appropriation of a trademark by another for the purpose of identifying, manufacturing, merchandising or promoting dissimilar products or services. The harm occurs when a trademark's identity and integrity—its capacity to command respect in the market—is undermined due to its inappropriate and unauthorized use by other market actors. When presented with such circumstances, courts have found that trademark owners have suffered harm despite the fact that redressing such harm entailed some residual impact on the rights of expression of commercial actors. *See, e.g., Dallas Cowboys Cheerleaders v. Pussycat Cinema, Ltd.*, 604 F.2d 200 (plaintiff's mark damaged by unauthorized use in content and promotion of a pornographic film); *Chemical Corp. of America v. Anheuser-Busch, Inc.*, 306 F.2d 433 (5th Cir.1962), *cert. denied*, 372 U.S. 965, 83 S.Ct. 1089, 10 L.Ed.2d 129 (1963) (floor wax and insecticide maker's slogan, "Where there's life, there's bugs," harmed strength of defendant's slogan, "Where there's life, there's Bud."); *Original Appalachian Artworks, Inc. v. Topps Chewing Gum*, 642 F.Supp.

1031 (N.D.Ga.1986) (merchandiser of "Garbage Pail Kids" stickers and products injured owner of Cabbage Patch Kids mark); *D.C. Comics, Inc. v. Unlimited Monkey Business,* 598 F.Supp. 110 (N.D.Ga.1984) (holder of Superman and Wonder Woman trademarks damaged by unauthorized use of marks by singing telegram franchisor); *General Electric Co. v. Alumpa Coal Co.,* 205 U.S.P.Q. (BNA) 1036 (D.Mass.1979) ("Genital Electric" monogram on underpants and T-shirts harmful to plaintiff's trademark); *Gucci Shops, Inc. v. R.H. Macy & Co.,* 446 F.Supp. 838 (S.D.N.Y. 1977) (defendant's diaper bag labelled "Gucchi Goo" held to injure Gucci's mark); *Coca-Cola Co. v. Gemini Rising, Inc.,* 346 F.Supp. 1183 (E.D.N.Y.1972) (enjoining the merchandise of "Enjoy Cocaine" posters bearing logo similar to plaintiff's mark).

 While the cases cited above might appear at first glance to be factually analogous to the instant one, they are distinguishable for two reasons. First, they all involved unauthorized commercial uses of another's trademark. Second, none of those cases involved a defendant using a plaintiff's trademark as a vehicle for an editorial or artistic parody. In contrast to the cases cited, the instant defendant used plaintiff's mark solely for noncommercial purposes. Appellant's parody constitutes an editorial or artistic, rather than a commercial, use of plaintiff's mark. The article was labelled as "humor" and "parody" in the magazine's table of contents section; it took up two pages in a one-hundred-page issue; neither the article nor appellant's trademark was featured on the front or back cover of the magazine. Drake did not use Bean's mark to identify or promote goods or services to consumers; it never intended to market the "products" displayed in the parody.[3]

We think the Constitution tolerates an incidental impact on rights of expression of commercial actors in order to prevent a defendant from unauthorizedly merchandising his products with another's trademark.[4] In such circumstances, application of the anti-dilution statute constitutes a legitimate regulation of commercial speech, which the Supreme Court has defined as "expression related solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Elec. v. Public Serv. Comm'n,* 447 U.S. 557, 561, 100 S.Ct. 2343, 2348, 65 L.Ed.2d 341 (1980). It offends the Constitution, however, to invoke the anti-dilution statute as a basis for enjoining the noncommercial use of a trademark by a defendant engaged in a protected form of expression:

> [T]he failure to distinguish between commercial and non-commercial speech

**3.** The issue of whether consumers were likely to believe that the "products" would be marketed is a factual issue that is not relevant to this appeal. The trial court denied summary judgment on all claims that depend upon the resolution of the issue of "likelihood of confusion" and our holding does not encompass that issue. We note that a parody which engenders consumer confusion would be entitled to less protection than is granted by our decision today. *See,* Note *Trademark Parody,* 72 Va.L.Rev. at 1112. A parody which causes confusion in the marketplace implicates the legitimate commercial and consumer protection objectives of trademark law.

**4.** We have no occasion to consider the constitutional limits which might be imposed on the application of anti-dilution statutes to unauthorized uses of trademarks on products whose principal purpose is to convey a message. *Mutual of Omaha Ins. Co. v. Novak,* 775 F.2d 247 (8th Cir.1985) (plaintiff entitled to preliminary injunction against peace activist protesting nuclear weapons proliferation by marketing "Mutant of Omaha" T-shirts). Such a situation undoubtedly would require a balancing of the harm suffered by the trademark owner against the benefit derived by the parodist and the public from the unauthorized use of a trademark on a product designed to convey a message. *See* Note, *Trademark Parody,* 72 Va.L.Rev. at 1112–16. Courts that have declined to enjoin unauthorized uses of trademarks that expressly employ parody have engaged in such balancing. *See Tetley, Inc. v. Topps Chewing Gum, Inc.,* 556 F.Supp. 785 (E.D.N.Y.1983) (defendant's marketing of stickers parodying various products did not dilute plaintiff's mark); *Girl Scouts of U.S.A. v. Personality Posters Mfg. Co.,* 304 F.Supp. 1228 (S.D.N.Y.1969) (rejecting plaintiff's claim of dilution caused by defendant's distribution of posters depicting a pregnant girl in a Girl Scout uniform along with a caption bearing the Girl Scout motto, "Be Prepared").

"could invite dilution, simply by a leveling process, of the force of the" First "Amendment's guarantee with respect to the latter kind of speech."

*Id.* at 563 n. 5, 100 S.Ct. at 2350 n. 5 (quoting *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978)).

If the anti-dilution statute were construed as permitting a trademark owner to enjoin the use of his mark in a noncommercial context found to be negative or offensive, then a corporation could shield itself from criticism by forbidding the use of its name in commentaries critical of its conduct. The legitimate aim of the anti-dilution statute is to prohibit the unauthorized use of another's trademark in order to market incompatible products or services. The Constitution does not, however, permit the range of the anti-dilution statute to encompass the unauthorized use of a trademark in a noncommercial setting such as an editorial or artistic context.

The district court's application of the Maine anti-dilution statute to appellant's noncommercial parody cannot withstand constitutional scrutiny. Drake has not used Bean's mark to identify or market goods or services; it has used the mark solely to identify Bean as the object of its parody. The reading of the anti-dilution provision advanced by the district court would improperly 'expand the scope of the anti-dilution statute far beyond the frontiers of commerce and deep into the realm of expression. "Courts obviously cannot regulate the type of descriptive, non-trade use involved here without becoming the monitors of the spoken or written English language." *Lucasfilm Ltd. v. High Frontier,* 622 F.Supp. at 935.

Our reluctance to apply the anti-dilution statute to the instant case also stems from a recognition of the vital importance of parody. Although, as we have noted, parody is often offensive, it is nevertheless "deserving of substantial freedom—both as entertainment and as a form of social and literary criticism." *Berlin v. E.C. Publications, Inc.,* 329 F.2d 541 (2d Cir.), *cert. denied,* 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33 (1964). *Accord Fisher v. Dees,* 794 F.2d 432, 437–38 (9th Cir.1986) (" 'Destructive' parodies play an important role in social and literary criticism and thus merit protection even though they may discourage or discredit an original author."); *Pring v. Penthouse International, Ltd.,* 695 F.2d 438 (10th Cir.1982), *cert. denied,* 462 U.S. 1132, 103 S.Ct. 3112, 77 L.Ed.2d 1367 (1983) (defendants' bawdy "spoof" and "ridicule" of Miss America pageant entitled to full range of first amendment protection); *Groucho Marx Productions v. Day and Night Co.,* 689 F.2d 317, 319 n. 2 (2d Cir.1982) (noting "the broad scope permitted parody in first First Amendment law."); *Elsmere Music v. National Broadcasting Co.,* 623 F.2d 252, 253 (2d Cir.1980) ("in today's world of unrelieved solemnity, copyright law should be hospitable to the humor of parody...."). It would be anomalous to diminish the protection afforded parody solely because a parodist chooses a famous trade name, rather than a famous personality, author or creative work, as its object.[5]

The district court's injunction falls not only because it trammels upon a protected form of expression, but also because it depends upon an untoward judicial evalua-

---

**5.** We recognize that the plaintiffs in *Pillsbury Co. v. Milky Way Productions, Inc.,* 215 U.S.P.Q. (BNA) 124 (N.D.Ga.1981), obtained injunctive relief against *Screw* magazine, which had published pictures of facsimiles of Pillsbury's trade characters, "Poppin Fresh" and "Poppie Fresh," engaged in sexual intercourse and fellatio. The pictorial also featured plaintiff's trademark and the refrain of its jingle, "The Pillsbury Baking Song." While the district court granted relief under Georgia's anti-dilution statute, 215 U.S. P.Q. at 135, it did so only after specifically

declining to consider whether defendants' presentation constituted a parody. *Id.* at 129–30. The defendants in *Pillsbury* had tried to proffer parody as a defense to plaintiff's copyright infringement claim; they did not assert it as a defense to the dilution claim. *Pillsbury,* therefore, does not stand for the proposition that the publication of a parody properly may be enjoined under an anti-dilution statute, since the court never considered whether defendants had presented a parody, and defendants never asserted parody as a defense to the dilution claim.

tion of the offensiveness or unwholesomeness of the appellant's materials. The Supreme Court has recognized the threat to free speech inherent in sanctioning such evaluations. *Cohen v. California*, 403 U.S. 15, 25, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971). Nevertheless, the district court was swayed by evidence suggesting that the "coarseness and baseness" of *High Society* would ineluctably damage Bean's mark. *L.L. Bean v. Drake*, 625 F.Supp. at 1536–37. The first amendment, however, does not warrant inquiry into "measures of distress or offensiveness, depending on the reader, listener or viewer." *United States v. Guarino*, 729 F.2d 864, 867 (1st Cir.1984) (en banc). While appellant's article is coarse and vulgar, "sexually explicit but nonobscene materials,[6] however distasteful, are entitled to no less protection than other forms of expression." *Fantasy Book Shop, Inc. v. City of Boston*, 652 F.2d 1115, 1126 (1st Cir.1981). *Accord Winters v. New York*, 333 U.S. 507, 518, 68 S.Ct. 665, 671, 92 L.Ed. 840 (1948); *Lerman v. Flynt Distributing Co.*, 745 F.2d 123, 138 (2d Cir.1984), *cert. denied*, 471 U.S. 1054, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985); *Pring v. Penthouse International, Ltd.*, 695 F.2d at 443.

Finally, we reject Bean's argument that enjoining the publication of appellant's parody does not violate the first amendment because "there are innumerable alternative ways that Drake could have made a satiric statement concerning 'sex in the outdoors' or 'sex and camping gear' without using plaintiff's name and mark." This argument fails to recognize that appellant is parodying L.L. Bean's catalog, not "sex in the outdoors." The central role which trademarks occupy in public discourse (a role eagerly encouraged by trademark owners), makes them a natural target of parodists. Trademark parodies, even when offensive, do convey a message. The message may be simply that business and product images need not always be taken too seriously; a trademark parody reminds us that we are free to laugh at the images and associations linked with the mark. The message also may be a simple form of entertainment conveyed by juxtaposing the irreverent representation of the trademark with the idealized image created by the mark's owner. *See* Note, *Trademark Parody*, 72 Va.L.Rev. at 1109. While such a message lacks explicit political content, that is no reason to afford it less protection under the first amendment. *Schad v. Mount Ephraim*, 452 U.S. 61, 65–66, 101 S.Ct. 2176, 2180–81, 68 L.Ed.2d 671 (1981). Denying parodists the opportunity to poke fun at symbols and names which have become woven into the fabric of our daily life, would constitute a serious curtailment of a protected form of expression.

*Reversed and remanded.*

LEVIN H. CAMPBELL, Chief Judge (dissenting).

I think it is premature to pass on the constitutionality of the Maine trademark dilution statute, Me.Rev.Stat.Ann. tit. 10, § 1530 (1981), without a determination whether, under Maine law, a pornographic parody of this kind would violate that statute.

Normally, we would ourselves make this determination, and, of course, we have jurisdiction to do so. There is, however, no realistic way for this court to predict how the Maine courts would apply the dilution statute in these circumstances. No Maine court has decided the question, and there appears to be no relevant precedent from other states having similar "dilution" statutes. Hence any decision of ours on whether, under Maine law, the Maine dilution statute proscribes defendant's conduct would tend to be guesswork. My colleagues do not attempt this, and I do not suggest anything would be gained by doing so.

But we have an avenue to secure a meaningful determination of whether or not defendant's conduct violated the Maine law. We, or better, the district court on remand, could certify the question to the Maine

---

**6.** The question of the obscenity of the article or the entire magazine has not been raised.

Supreme Judicial Court. I recognize there is an obstacle to certification at this stage in the case. The Maine Supreme Judicial Court has expressed an unwillingness, as a matter of policy, to accept a certified question that will not be dispositive of a federal case. *See* Me.Rev.Stat.Ann. tit. 4, § 57 (Supp.1986); Me.R.Civ.P. 76B(a); *White v. Edgar*, 320 A.2d 668, 677 (Me.1974); *In re all Maine Asbestos Litigation*, 772 F.2d 1023, 1026 n. 4 (1st Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 1994, 90 L.Ed.2d 675 (1986). The court might believe that situation was present here, as the case still awaits trial of the likelihood of confusion issue. If plaintiff proves likelihood of confusion, it might obtain on other grounds all the relief it requested, in effect mooting the dilution claim.

But while the Maine court might decline certification at this juncture, we could remand with directions to the district court to certify at a later time, whenever the proceedings below have reached a stage that certification is in order.[7]

Certification would permit the state court to decide whether or not a pornographic parody of this type constitutes trademark dilution under the Maine statute. For some of the same reasons suggested in Judge Bownes's opinion, it may not—in which case there would be no need for us to address the constitutional issue at all. If, on the other hand, the state court were to hold that the dilution statute was offended by defendant's conduct, we would have the benefit of the Maine court's reasoning—which might give rise to somewhat different First Amendment issues depending, for example, on whether it rested solely on the special offensiveness of a pornographic parody, or whether it found the statute reached *any* parody.

It would, in any event, be more in keeping with the canons of constitutional adjudication and with the proper division of responsibilities between state and federal courts to ask the state court to determine the coverage of the trademark dilution stat-

ute in regard to conduct such as existed here. *See Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) ("[t]he Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.... Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter") (*citing Light v. United States,* 220 U.S. 523, 538, 31 S.Ct. 485, 488, 55 L.Ed. 570 (1911); *Siler v. Louisville & Nashville R. Co.,* 213 U.S. 175, 191, 29 S.Ct. 451, 454, 53 L.Ed. 753 (1909)); *see also Rescue Army v. Municipal Court,* 331 U.S. 549, 568–72, 67 S.Ct. 1409, 1419–21, 91 L.Ed. 1666 (1947) (explaining why courts should avoid unnecessary constitutional adjudication).

I can understand why, with immediate certification probably unavailable, my colleagues do not care to delay. But there is no reason why the likelihood of confusion issue cannot be speedily resolved, after which, assuming the controversy continues, certification can take place. And I do not find the constitutional issue either easy or obvious, nor in such need of instant resolution that it cannot await a more deliberate process.

I would, therefore, remand without deciding the constitutional issue, directing the district court to certify to the Maine Supreme Judicial Court, at an appropriate later stage in the proceeding, the question whether Maine's dilution statute covers this type of conduct. Until we have the answer to this question, I would not consider the constitutional question. I therefore dissent.

---

**7.** Were plaintiff to prove likelihood of confusion, controversy over the dilution claim might, of course, cease, making it unnecessary to decide that claim in this case. If so, that would simply be one more example of the fact that *courts exist to decide live controversies, not* abstract questions. Such a result should cause no alarm.