814 F.Supp. 791 (1993)
ANHEUSER-BUSCH, INC., Plaintiff,
v.
BALDUCCI PUBLICATIONS, et al., Defendants.
No. 89-0872-C(7).
United States District Court, E.D. Missouri, E.D.
February 22, 1993.
*792 Thomas J. Cotter, Associate, Norman S. London, Managing Partner, St. Louis, MO, Richard Lehv, Lawrence S. Rickles, Weiss and Dawid, New York City, for plaintiff.
James E. Parrot, Richard E. Schwartz, President, Richard Schwartz and Associates Ltd., St. Louis, MO, for defendants.

MEMORANDUM AND ORDER
HAMILTON, District Judge.
Plaintiff Anheuser-Busch, Inc. asserts five causes of action in this matter: (1) trademark infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); (2) unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (3) infringement of trademarks registered in Missouri under Mo.Rev.Stat. § 417.056; (4) common law unfair competition; and (5) dilution of Plaintiff's marks and injury to its business reputation under Mo.Rev.Stat. § 417.061. Plaintiff seeks one dollar in nominal damages and injunctive relief. The Court heard evidence on this matter June 25, 26, and 29, 1992. Also pending before the Court is Plaintiff's Motion For Leave to Supplement the Record.

I. Motion for Leave to Supplement the Record
Plaintiff seeks leave to supplement the record to add Supplemental Exhibits 1, 2, 3, and 4. These Exhibits are the current issue of Snicker magazine, the November 1992 edition of the St. Louis Journalism Review, and excerpts from both publications. The excerpted portions state that Snicker magazine is now distributed nationwide. Defendants do not oppose Plaintiff's Motion. The Court will grant Plaintiff's Motion to Supplement the Record.

II. Findings of Fact
1. Plaintiff Anheuser-Busch, Inc. is a Missouri corporation that brews a wide variety of popular beers. Among those beers is the Michelob family of beers which includes Michelob, Michelob Dry, Michelob Light and Michelob Classic Dark.
2. Plaintiff's Missouri brewery uses water from the Gasconade River to produce its beers. There was an oil spill in the Gasconade River in 1988. Plaintiff's beers were not contaminated as a result of the oil spill.
3. Plaintiff owns various federally registered trademarks which it uses to market its beers. The following trademarks are at issue in this litigation: (1) Michelob; (2) Michelob Dry; (3) A & Eagle Design; (4) Bottle and Label Configuration; (5) Bottle Configuration; (6) Vertical Stripe Design; (7) the phrase "ONE TASTE AND YOU'LL DRINK IT DRY;" and (8) Vertical Stripe and A & Eagle Design.
4. In addition, the A & Eagle Design and the term "Michelob" are registered Missouri trademarks.
5. These marks are all famous and are generally known to refer to Anheuser-Busch and to beer brewed by Anheuser-Busch.
*793 6. Plaintiff uses its marks to advertise its products. Plaintiff has also used its marks in a series of advertisements concerning the environment.
7. Defendant Balducci Publications is a Missouri business entity owned by Defendants Richard Balducci and Kathleen Balducci. Defendants publish Snicker magazine, a humor magazine.
8. Snicker magazine is distributed throughout the St. Louis area and, as of the end of 1992, nationwide.
9. Issue No. 5½ of Snicker was published in April 1989. On the back cover of Issue 5½ Defendants published a mock advertisement for a fictional product called Michelob Oily. This mock advertisement is the subject matter of this lawsuit.
10. The mock advertisement contains the phrase "One Taste and You'll Drink it Oily" in bold type and the phrase "Michelob Oily" followed by the symbol ®. At the bottom of the page is the phrase "At the rate it's being dumped into our oceans, lakes and rivers, you'll drink it oily sooner or later, anyway." At the side of the page, in small type, are the words: "Snicker Magazine Editorial by Rich Balducci. Art by Eugene Ruble. Thank goodness someone still cares about quality (of life)."
11. Plaintiff has used the slogan "Somebody still cares about quality" and the trademark "ONE TASTE AND YOU'LL DRINK IT DRY" to advertise and sell its products.
12. The mock advertisement depicts a human hand holding a crumpled Michelob Dry can. The thumb of the hand partially obscures the word "Dry." Oil and an oily fish spill from a spigot inserted in the can. The can is a photograph of an actual Michelob Dry can.
13. At the center of the page, is a drawing of an oil-drenched eagle exclaiming "Yuck!" The eagle is standing inside of the letter "A." This design strongly resembles, but is not identical to, Plaintiff's A & Eagle logo.
14. A six pack of beer is depicted at the bottom left-hand corner of the page. In the bottom right-hand corner of the page, there is a representation of two beer bottles and a mug of beer. "Michelob Oily" is written on all of the bottles and on the mug. The bottles are in the trademarked configuration of Michelob Dry bottles.
15. The mock advertisement published on the back page of Issue 5½ and described in Findings of Fact 9-14 is an ad parody.
16. Defendants produced the ad parody to express an opinion regarding the dangers of pollution in the nations waterways and also to comment on Plaintiff's "brand proliferation."
17. Defendant Richard Balducci expressed negative opinions regarding Plaintiff's corporate officers and its employees.
18. The artwork on the back page of Issue 5½ was prepared, in part, by Eugene Ruble at the direction of Richard Balducci.
19. Mr. Ruble used Anheuser-Busch clip-art to prepare the piece. Clip-art is prepared by Anheuser-Busch to ensure accurate and consistent representation of Plaintiff's marks. Specifically, Mr. Ruble used clip art to represent the six pack of Michelob Oily, the two bottles of Michelob Oily and the mug, and the words "Michelob Oily."
20. In addition, Mr. Ruble used the Anheuser-Busch A & Eagle design as the basis for his rendition of an "A" and an eagle in the ad parody.
21. In sum, Defendants clearly used Plaintiff's marks in their ad parody, they used some of those marks without alteration, and they did so without Plaintiff's permission.
22. Defendants' use of Plaintiff's marks did not create a likelihood of confusion in the marketplace.[1]
23. Any Findings of Fact not specifically stated in these Findings of Fact but set forth in the Conclusions of Law is incorporated herein.

III. Conclusions of Law

A. Jurisdiction
The case presents claims arising under the trademark laws of the United States. The *794 Court has jurisdiction over these claims pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1338. The Court has supplemental jurisdiction over Plaintiff's state law claims. 28 U.S.C. § 1367.

B. Trademark Infringement
Plaintiff maintains that Defendants' unauthorized use of Plaintiff's marks constitutes trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).[2] Whether an allegedly infringing use of a protected mark violates the Act depends upon whether, under all the circumstances, there is a likelihood of confusion as to source, sponsorship or affiliation. SquirtCo v. Seven-Up, Co., 628 F.2d 1086 (8th Cir.1980); J. Thomas McCarthy, Trademarks and Unfair Competition, § 31:38 (1984). In SquirtCo, the court identified six factors relevant to a determination of whether the allegedly infringing use of another's trademark creates a likelihood of confusion: (1) the strength of the mark; (2) the similarity between the trademark and the defendant's mark; (3) the competitive proximity of the products on which the respective marks are placed; (4) the intent of the alleged infringer to pass off his goods as those of the trademark holder; (5) the incidents of actual confusion; and (6) the degree of care likely to be exercised by the potential customers of the trademark holder. Id. at 1091.
The Eighth Circuit applied the likelihood of confusion factors in Mutual of Omaha Ins., Co. v. Novak, 836 F.2d 397, 399 (8th Cir.1987) cert. denied, 488 U.S. 933, 109 S.Ct. 326, 102 L.Ed.2d 344 (1988). In that case, the defendant, Michael Novak, was a designer who manufactured and distributed T-shirts and coffee mugs bearing the slogan "Mutant of Omaha." Defendant's merchandise also depicted a side-view of a feather-bonneted, emaciated human head. Defendant's design was intended to raise awareness of the threat of nuclear war. Mutual of Omaha contended that defendant's use of these designs infringed Mutual of Omaha's trademark in its Indian head logo and in the phrase "Mutual of Omaha." The court concurred.
However, in upholding a permanent injunction entered by the district court, the Eighth Circuit noted that the injunction "in no way infringes upon the constitutional protection the First Amendment would provide were Novak to present an editorial parody in a book, magazine, or film." Id. at 402. The court further stated that Novak was "prohibited from using the design only in the specific commercial ways mentioned in the injunction." Id. at 403 n. 8. On its face, this language would seem to support Defendants' argument that their use of Plaintiff's marks in an ad parody is absolutely protected under the First Amendment to the United States Constitution. However, in Mutual of Omaha, the First Amendment issue was not before the court. Thus, this Court also consults the reasoning of trademark cases wherein the First Amendment defense is squarely presented.
It is well-settled that parody is a form of expression protected by the First Amendment. Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988); Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Group, Inc., 886 F.2d 490, 493 (2d Cir.1989). Trademark parody is a subspecies of the genre that pokes fun at or criticizes a business entity by spoofing the entity's trademarks. Trademark parody is only effective if the mark is well-known and the parody is enough like the original to *795 invoke an association. Cliffs Notes, 886 F.2d at 494 ("the keystone of parody is imitation"). Thus, trademark parodies raise a legal tension not unlike that addressed by the fair use doctrine of copyright law: a tension between the legitimate property rights of the trademark owner and the rights of the parodist to free expression.
In resolving this tension, courts have considered the purposes of trademark protection. Trademark is a form of intellectual property. L.L. Bean, Inc. v. Drake Publishers, Inc., 811 F.2d 26, 29 (1st Cir.) cert. denied, 483 U.S. 1013, 107 S.Ct. 3254, 97 L.Ed.2d 753 (1987). By registering a trademark,
[t]he owner of the mark acquires the right to prevent the goods to which the mark is applied from being confused with those of others and to prevent his own trade from being diverted to competitors through their use of misleading marks.
Power Test Petroleum Distributors, Inc. v. Calcu Gas, Inc., 754 F.2d 91, 97 (2d Cir.1985) (quoting Industrial Rayon Corp. v. Dutchess Underwear Corp., 92 F.2d 33, 35 (2d Cir. 1937), cert. denied, 303 U.S. 640, 58 S.Ct. 610, 82 L.Ed. 1100 (1938)). The scope of the trademark owner's property right is determined by the purposes of trademark law: to eliminate consumer confusion and unfair competition in the marketplace. L.L. Bean, 811 F.2d at 29. See also Jordache Enterprises, Inc. v. Hogg Wyld, Ltd., 828 F.2d 1482, 1486 (10th Cir.1987) (trademark protects against confusion as to the source of a mark; "which is not the same thing as a right not to be made fun of") (quoting 2 J. Thomas McCarthy, Trademarks and Unfair Competition, § 31:38 at 670 (2d ed. 1984)).
In L.L. Bean, the First Circuit distinguished between allegedly infringing uses of a registered trademark for commercial purposes and trademark parody. In L.L. Bean, plaintiff sought to enjoin the publication of the October 1984 issue of High Society magazine because the magazine continued a two page parody entitled "L.L. Beam's Back-To-School-Sex-Catalog." The parody incorporated a facsimile of the L.L. Bean trademark in a mock advertisement for sex-related products. The district court granted summary judgment for plaintiff on its state law anti-dilution claim[3] and enjoined further publication. The First Circuit held that the injunction offended the First Amendment. The court considered the scope of a trademark owner's property rights and determined that the trademark owner's rights extend only to unauthorized commercial uses of a registered mark. Id. at 29 (citing Lucasfilm Ltd. v. High Frontier, 622 F.Supp. 931, 933-35 (D.D.C.1985)). The court balanced the limited scope of this property right against the importance of parody and determined that the injunction must fall. Id. at 33.
It is important to note that the likelihood of confusion issue was not before the court in L.L. Bean. The court acknowledged that a parody which engendered confusion in the marketplace would implicate the legitimate commercial and consumer protection objectives of trademark law. Id. at 32 n. 3. The difficult task presented by trademark parody cases is to determine when the defendant's use of a registered mark in an editorial context creates a likelihood of confusion in the marketplace and therefore implicates the purposes of the Lanham Act.
The courts that have grappled with this issue have not settled on a uniform approach. The First Circuit, in L.L. Bean, recognized that a trademark parody might engender marketplace confusion but did not propose a test for determining when such confusion exists. The Second Circuit has adopted a balancing test. Specifically, the Second Circuit asks whether, in a given instance, the public interest in avoiding consumer confusion outweighs the public interest in free expression. Cliffs Notes, supra; Rogers v. Grimaldi, 875 F.2d 994 (2d Cir. 1989). This court sees no reason to abandon the traditional likelihood of confusion test set forth in SquirtCo, provided that it is applied *796 with special sensitivity to the purposes of trademark law and the First Amendment rights of the Defendants. See e.g., Pillsbury Co. v. Milky Way Productions, Inc., 215 U.S.P.Q. (BNA) 124 (N.D.Ga.1981) (applying likelihood of confusion factors to parody of Poppin' Fresh doughboy in Screw magazine).
The first two factors of the likelihood of confusion test are easily addressed. The parties agree that Plaintiff's marks are strong. There is also a great similarity between Plaintiff's marks and Defendants' rendition of those marks in its ad parody. However, Defendant's humor magazine and Plaintiff's beers are not in competitive proximity. See Pillsbury, 215 U.S.P.Q. (BNA) at 133-34 (food products and pornographic magazines "not even remotely similar"). Plaintiff attempts to mitigate this obvious fact by noting that Defendant's parody is of a beer advertisement and Plaintiff uses its marks in beer advertisements. In addition, Plaintiff notes that it has used its marks in a series of advertisements concerning the environment. This is unpersuasive. Plaintiff has identified a superficial similarity of uses. This does not amount to a plausible concern that the products at issue in this litigation are competing for consumer dollars or attention in the marketplace. See Mutual of Omaha, 836 F.2d at 399, 402-03 n. 8 (distinguishing between infringing use of mark on similar though not directly competitive products and protected use in noncommercial pamphlets); J. Thomas McCarthy, Trademarks and Unfair Competition, § 31.37 (2d ed. Supp.1990) (First Amendment protection greatest when parody appears in magazine because magazines are "a traditional medium for conveying information").
With regard to the intent of the alleged infringer, the Court notes that Defendant Richard Balducci testified that his intent in producing the ad parody was to comment on the pollution in our water supply, particularly as a result of an oil spill in the Gasconade river, and to spoof the proliferation of Plaintiff's brands of beer. Plaintiff suggests that Defendants were motivated by an intent to injure Plaintiff. In support of this contention, Plaintiff notes that Mr. Balducci criticized the chairman of Anheuser-Busch for failing to use his wealth to benefit the St. Louis community. Mr. Balducci also directed negative remarks about the Anheuser-Busch employees to Ms. Serrano, Anheuser-Busch corporate counsel. However, Mr. Balducci's opinions about Plaintiff, its chairman and its employees are not relevant here. The relevant intent is whether Defendants intended to pass their product off as that of Plaintiff. See SquirtCo, 628 F.2d at 1091. The record contains no suggestion, and Plaintiff does not contend, that Defendants intended to pass off Snicker magazine as an Anheuser-Busch product or even that they intended to pass off their ad parody as an actual Anheuser-Busch advertisement.
Plaintiff relies heavily on a survey designed by Jacob Jacoby, Ph.D. and conducted under the supervision of Leon B. Kaplan, Ph.D. to show a high incidence of actual confusion regarding sponsorship or authorization of the ad parody. The survey was conducted in shopping malls in the St. Louis area. The 301 respondents were beer drinkers or purchasers who claimed to read or look through magazines or newspapers at least once a month. Two hundred participants were shown the ad parody. The rest were shown a regular Michelob Dry ad. The survey indicated that 58% of the participants exposed to the ad parody believed that "the people who were responsible for creating [the ad parody] did have to get permission to use the Michelob name." Plaintiff's Exhibit 3, Jacoby Report at 21. Similarly, 56% of the participants believed that the people who created the ad parody had to get permission to use the A & Eagle logo and other pictures. Plaintiff's Exhibit 3, Jacoby Report at 22. In addition, when asked what came to mind when they saw the back page of Snicker, 6% of the participants responded with answers that were classified[4] as indicating that they thought the piece was an Anheuser-Busch *797 advertisement. Plaintiff's Exhibit 3, Jacoby Study, at 13.
Plaintiff suggests that these results mandate a finding that the ad parody creates a likelihood of confusion with Plaintiff's marks. The Court has no quarrel with the design or execution of the Jacoby study. However, in the context of an editorial presented in a humor magazine, these statistics are not convincing evidence that Defendants' ad parody has created a likelihood of confusion in the marketplace. First, the Court notes that half of the participants who saw the Snicker ad parody responded affirmatively when asked "As you look at this page, is there anything about it that says or suggests to you that it is an editorial?" Plaintiff's Exhibit 3, Jacoby Study, at App. B, table 15. In addition, when asked what came to mind when they saw the back page of Snicker, 37% of the participants responded with answers that were classified as indicating that they thought the piece was satire. Jacoby Study, app. B, table 4. Plaintiff's statistical evidence may well be persuasive in the context of a classic trademark infringement case wherein the plaintiff claims that defendant benefited in the marketplace by virtue of an unauthorized use of plaintiff's marks. However, the Court concludes that, here, where the allegedly infringing use occurs in an editorial context, the evidence fails to establish that Defendants' use of Plaintiff's marks has created actual confusion in the marketplace.
Finally, Plaintiff contends that the degree of care a potential consumer will exercise in assessing the sponsorship of the ad parody is heavily influenced by the fact that the ad parody is on the back cover of Snicker magazine where other, legitimate, advertisements appeared in some previous issues. Once again, however, the First Amendment concerns at issue in this litigation require closer examination of Plaintiff's claim. The Court accepts the possibility that a superficial observer might believe that the ad parody was approved by Anheuser-Busch. However, Plaintiff has failed to establish that a consumer's failure to exercise the care necessary to distinguish between Plaintiff's marks and Defendants' use of those marks will, in and of itself, influence marketplace decisions.[5]
For all of the foregoing reasons, the Court finds that Plaintiff has failed to establish that Defendants' ad parody creates a likelihood of confusion in the marketplace and consequently, Plaintiff has failed to prove its claim of trademark infringement under the Lanham Act. Accordingly, the Court will enter judgment for Defendants on Plaintiff's claim for trademark infringement under Section 32(1) of the Lanham Act.

C. Unfair Competition Claims
Plaintiff alleges that Defendants' ad parody also violates Section 43(a) of the Lanham Act.[6] Plaintiff maintains that Defendants' unauthorized use of the Anheuser-Busch marks both creates a likelihood of confusion and misrepresents "the nature, characteristics, [or] qualities" of Anheuser-Busch beer. The likelihood of confusion issue has been addressed above. With regard *798 to Plaintiff's allegation that Defendants' ad parody misrepresents the quality of Plaintiff's beers, the Court notes that, by its terms, Section 43(a) of the Lanham Act applies to misrepresentations concerning the nature, characteristics, and qualities of another's goods "in commercial advertising or promotion." 15 U.S.C. § 1125(a)(2) (emphasis added); WSM, Inc. v. Hilton, 724 F.2d 1320, 1331 (8th Cir.1984) (Section 43(a) creates federal remedy for unfair competition in connection with the sale of a product).
Plaintiff contends that Defendants do use Plaintiff's marks to sell their product because a portion of the ad parody is shown in connection with an advertisement for back issues of Snicker magazine. Plaintiff has provided no support for the proposition that noncommercial speech is converted to commercial speech when a magazine publisher provides some indication of the contents of his publication in order to entice sales. In New York Times Co. v. Sullivan, 376 U.S. 254, 266, 84 S.Ct. 710, 719, 11 L.Ed.2d 686 (1964), the Supreme Court held that "alleged libellous statements [that] would otherwise be constitutionally protected ... do not forfeit that protection because they were published in the form of a paid advertisement." The Court reasoned that it would shut off an important avenue for the dissemination of information and ideas if otherwise protected speech lost its protection because it was published in exchange for money. Id. A similar rationale applies here. Moreover, although Plaintiff did not introduce any evidence addressing the likelihood of confusion arising from Defendants' use of a small portion of this ad parody in connection with an advertisement for back issues, it stands to reason that if the full page, back cover parody did not engender a likelihood of confusion, the use at issue here does not either.
Because Defendants' ad parody was not in any way connected with the sale of a product and because Plaintiff has failed to establish a likelihood of confusion in the marketplace, the Court will enter judgment for Defendants on Plaintiff's unfair competition claims.

D. State Law Claims based on Infringement and Unfair Competition
Plaintiff contends that Defendants' ad parody infringes its marks in violation of Mo. Rev.Stat. § 417.056 and also constitutes common law unfair competition. The elements of these state law claims are identical to the elements of claims asserted under the Lanham Act. Novak, 836 F.2d at 398 n. 1; WSM, Inc., 724 F.2d at 1331 n. 6. Therefore, for the reasons set forth above, the court will enter judgment for Defendants on Plaintiff's state law infringement and unfair competition claims.

E. State Law Anti-Dilution Claim
Finally, Plaintiff claims that Defendants' ad parody violates Missouri's anti-dilution statute.[7] State anti-dilution statutes provide a broader protection than the trademark infringement and unfair competition provisions of the Lanham Act. To establish a violation of Mo.Rev.Stat. § 417.061, Plaintiff must show that its marks are valid, that the marks are distinctive, and that Defendants' use of the marks created a likelihood of dilution of the distinctive quality of Plaintiff's marks. Gilbert/Robinson, Inc. v. Carrie Beverage-Missouri, Inc., 758 F.Supp. 512, 527 (E.D. Mo.1991). Clearly, Plaintiff's marks are valid and distinctive. Plaintiff maintains that the same evidence that establishes a likelihood of confusion also establishes a likelihood of dilution of Plaintiff's marks. In addition, Plaintiff maintains that Defendants' ad parody tarnishes Plaintiff's reputation insofar as it suggests or implies that Plaintiff's beers are contaminated with oil. Plaintiff cites to no authority construing the Missouri statute in the face of a First Amendment defense. The Court's own research indicates that the cases decided under Mo.Rev.Stat. § 417.061 concern claims *799 brought by trademark holders against other market actors.
The First Circuit addressed the purpose of anti-dilution statutes as follows:
A trademark is tarnished when consumer capacity to associate it with the appropriate products or services has been diminished. The threat of tarnishment arises when the goodwill and reputation of a plaintiff's trademark is linked to products which are of shoddy quality or which conjure associations that clash with the associations generated by the owner's lawful use of the mark.
L.L. Bean, 811 F.2d at 31. The First Circuit concluded that "neither the strictures of the first amendment nor the history and theory of anti-dilution law permit a finding of tarnishment based solely on the presence of an unwholesome or negative context in which a trademark is used without authorization." Id.
This Court has previously concluded that Defendants' use of Plaintiffs marks does not create a likelihood of confusion in the marketplace. Thus, Plaintiff's attempt to use that test to prove its allegations of dilution must fail. Moreover, because Defendants' use of Plaintiff's marks occurred in an editorial context, there is no threat of tarnishment through association with shoddy or disharmonious products. Accordingly, the Court will enter judgment for Defendants on Plaintiff's state law anti-dilution claim.
IT IS HEREBY ORDERED that Plaintiff's claims for relief are DISMISSED with prejudice.
NOTES
[1] The reasoning underlying this Finding of Fact is discussed below.
[2] The Act provides in pertinent part:

Any person who shall, without the consent of the registrant
(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with such use is likely to cause confusion, or to cause mistake or to deceive; or
(b) reproduce, counterfeit, copy or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.
shall be liable in a civil action by the registrant for the remedies hereinafter provided.
15 U.S.C. § 1114(1)(a), (b).
[3] Plaintiff also brought trademark infringement, unfair competition and deceptive trade practices claims. Likelihood of confusion is an element of all of these claims. Because likelihood of confusion is a question of fact, the court denied summary judgment on those claims. L.L. Bean, 811 F.2d at 27.
[4] Answers to open-ended questions were classified, or coded, by the staff at Princeton Research & Data Consulting Center, Inc. (PRCC) under the supervision of Leon B. Kaplan. PRCC staff members read the answers and developed a set of response categories. These categories were approved by Dr. Jacoby.
[5] The Jacoby study indicates that some people may be less likely to drink or purchase Michelob beer because, as a result of Defendants' ad parody, they believe that it is contaminated with oil. This alleged result stems, however, from the content of Defendants' ad parody and is not the result of a mistaken reliance on an infringing use of Plaintiff's marks. See e.g. Cliffs Notes, 886 F.2d at 496-97 (considering whether consumers would believe defendant's parody of Cliffs Notes was actually produced by Cliffs Notes and purchase it in mistaken reliance on those elements of the parody that were similar to Cliffs Notes).
[6] Section 43(a) of the Lanham Act provides:

(a) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which
(1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
(2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services or commercial activities,
shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
15 U.S.C. § 1125(a).
[7] Missouri's anti-dilution law provides:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under sections 417.005 to 417.066, or a mark valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as the source of goods or services.
Mo.Rev.Stat. § 417.061(1).