The TIME INC. MAGAZINE
COMPANY, Plaintiff,

v.

GLOBE COMMUNICATIONS
CORPORATION, Defendant.

No. 89 Civ. 2336 (RWS).

United States District Court,
S.D. New York.

May 9, 1989.

Robin Blecker & Daley, New York City, for plaintiff; Albert Robin, of counsel.

Gold, Farrell & Marks, New York City, for defendant; Leonard M. Marks, of counsel.

## OPINION

SWEET, District Judge.

Plaintiff The Time Inc. Magazine Company ("Time") has moved by an Order to Show Cause for a preliminary injunction pursuant to Rule 65 Fed.R.Civ.P. restraining defendant Globe Communications Corporation ("Globe") from using elements of the plaintiff's People Weekly ("*People*") cover format, claiming that such use constitutes statutory unfair competition violating Section 43(a) of the Lanham Act, 15 U.S.C.

§ 1125(a) and common law unfair competition under New York law. Upon the findings and conclusions set forth below, the motion for a preliminary injunction is granted.

*Prior Proceedings*

This action was filed on the date that the Order to Show Cause was obtained, April 11, 1989. The motion was considered on affidavits, argued and fully submitted on April 21, 1989. The facts set forth below are uncontested except as noted.

*Facts*

Plaintiff Time is a Delaware corporation with its principal place of business in New York. It is engaged in the publication of magazines, including *People*, which are offered for sale, sold, and distributed here in New York. The principal readership of *People* is men and women in their 20s and 30s. Time has published *People* since 1974 on a weekly basis. Since then the magazine has enjoyed much popularity and broad circulation. Between 1981 and 1988, over 1,130,000,000 copies of the magazine have been sold. Sales revenue for *People* during the same period exceeded $1,340,-000,000.

Time has continuously advertised and promoted *People* through television commercials, for which Time has spent over $10 million, in each of the past five years, over 7,500,000 direct mail solicitations and promotions conducted by agencies such as Publishers Clearing House and American Family Publishers. More than half of the sales of the magazine sold at $1.79 per copy, occur at newsstands, grocery stores, supermarkets, terminals and bookstores. Over half of these sales occur at grocery stores and supermarkets, where magazines are stacked on racks and portions of the covers are hidden.

Time claims without refutation that many of their purchasers are repeat buyers who are looking for a familiar cover format and take an average of six seconds to decide which magazine they will purchase. *Time* therefore alleges that their cover format is the single most important selling

tool in these advertising and promotional vehicles.

The *People* cover format has had few changes since its first publication in 1974. The logo has appeared in substantially the same manner, displayed in white Egyptian extra bold condensed type. The logo is also hand-altered so that the letters touch or blend into each other.

Beginning in 1982, all cover billings appeared in helvetica extra bold condensed type. For the past one and a half years, the cover billings have consistently used a combination of typefaces with the main headline in futura extra bold condensed type and with all other cover billings remaining in helvetica extra bold condensed type. In addition, 90% of the covers use a drop shadow on the main headline type.

Since 1987, *People* has frequently displayed a photograph in the upper right hand corner of the cover, accompanied by a secondary billing set off within a bar or rule, placed to the left of the photograph.

Time maintains that the cover of *People* plays a critical role in the newsstand sales and that the substantially consistent cover subject and cover format are used to attract readers who rely on the distinctive cover format in selecting the magazine for purchase. Time claims that the distinctiveness of the cover lies in the combination of various elements such as:

(1) The white Egyptian extra bold condensed type which has been hand altered so that the letters touch or blend into each other;

(2) The display of the logo with a contrasting colored border;

(3) The positioning of a secondary cover photograph in the upper right hand corner; and

(4) The placement of a secondary billing along the top portion of the cover set off within a bar or rule.

According to Time, these elements combine to give *People* a unique cover format that is universally associated with the magazine and is a means by which it is known to the public and its source of origin identified.

Globe is a New York Corporation with its principal place of business in New York. It publishes over twenty newspapers and magazines, including *Celebrity Plus* ("*Celebrity*"), the magazine at issue in this action. *Celebrity* is a celebrity-oriented magazine containing news and articles about famous persons, supplemented with photographic material. The magazine has also dealt with health-related and self-help issues.

*Celebrity*'s readership is comprised primarily of women between the ages of 39 and 44. The magazine is published on a monthly basis. In the two and one half years that the magazine has been on the market, Globe has invested over $6 million dollars in its development, promotion and marketing. Approximately 250,000 copies are printed per month at $1.95 per copy in most locations.

Globe's first publication of the magazine in January 1987, originally called *Celebrity Focus*, displayed the name *Celebrity Focus* in a bold white typeface logo, highlighted by a black dropped shadow. The dropped-shadow effect used on the logo was also employed on the typeface of the cover billings which were vertically displayed alongside the cover photograph. A star design of contrasting color appeared over the "i" in the *Celebrity Focus* title in lieu of a dot.

After some months, Globe experimented with a new cover format to increase its newsstand sales. Accordingly, in June 1987, the cover format of *Celebrity Focus* displayed a secondary cover billing along the top portion of the cover page set within a contrasting color rule.

Globe's statistics demonstrated that sales had risen as a result of that effort. Globe continued to experiment with the cover format and, in September 1987, added a secondary photograph to the upper left-hand corner of the cover page relevant to the adjacent secondary billing.

The inset photograph remained on the upper left-hand portion of the cover page for several months, but the dropped-shadow of the *Celebrity Focus* logo was eliminated. Alternatively, Globe experimented with several color designs for the title and,

in the October 1987 issue of *Celebrity Focus*, employed a black border around the letters of the logo.

The secondary billing set off by a rule of contrasting color remained an element of the *Celebrity Focus* cover format from June 1987 to February 1988 and, during that period, secondary photographs were frequently displayed and placed either adjacent to or within the contrasting rule appearing along the top portion of the cover page. In addition, a dropped shadow effect was sometimes employed on the typeface of the main cover billings.

In March 1988, the title of the magazine was changed from *Celebrity Focus* to *Celebrity Plus*, with a script typeface for the new title logo.

Globe has maintained the *Celebrity Plus* title to the present, and, until May 1989, employed the script typeface in the logo. For several of the *Celebrity Plus* issues from April 1988 to April 1989, the letters of the logo have appeared within a border of contrasting color and on several of the issues, those letters are white with a contrasting outline. On a number of issues, there is a second "cover" across the top with a secondary photograph set adjacent to the billing in the upper right-hand corner.

In the final months of 1988 and the first few months of 1989, the *Celebrity Plus* logo was considerably reduced in size from previous issues and the cover format assumed a more tabloid-like appearance containing numerous photographs and headlines.

For the May 1989 issue, *Celebrity* altered its cover format to contain the elements listed above which were already a part of *People's* cover format. Time wrote to Globe to discontinue the new format and with Time's objections in hand, altered the *Celebrity* logo from "bold egyptienne serif" typeface to "bold folio sans-serif" and used a star in place of a dot over the letter "i" in the word *Celebrity*. Further, the June cover will incorporate the legend "A Globe Publication" under the logo, accompanied by Globe's pictured trademark of the western hemisphere.

Notwithstanding these alterations, Time asserted that Globe's use of the elements listed above of *Celebrity* magazine constituted trade dress infringement requiring injunctive relief.

*Preliminary Injunction*

■ In order to obtain a preliminary injunction, the moving party must establish:
> (a) irreparable harm and (b) either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.

*Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir.1988); *Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*, 832 F.2d 1311, 1314 (2d Cir.1987); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979). Because Time has shown both irreparable harm and a likelihood of success on the merits as to the trade dress infringement of their distinctive cover format, the preliminary injunction will be granted.

*Trade Dress Infringement under the Lanham Trademark Act and the Unfair Competition Claim*

According to Time, Globe's cover format of *Celebrity* constitutes a false designation of the origin of the magazine and a false description and representation that *Celebrity* is Time's magazine or endorsed or connected in some way with Time, and that Globe with knowledge, has caused its magazines to enter commerce in violation of section 43(a) of the Lanham Act and New York's Unfair Competition Act.

■ The trade dress of a product involves the total image of the product and may include characteristics of size, shape, color or color combinations, texture or graphics. *John H. Harland Co. v. Clark Checks, Inc.*, 711 F.2d 966, 980 (11th Cir. 1983). A trade dress may be protected under section 43(a) if it is nonfunctional and has acquired a secondary meaning in the market place by which it is identified with its producer or its source. *LeSportsac, Inc. v. K Mart Corporation*, 754 F.2d

71, 75 (2d Cir.1985). Section 43(a) affords protection against trade dress infringement. For the reasons set forth below, Time possesses a protectible trade dress.

### 1. Functionality

■ Globe has the burden of proving functionality as a defense to trade dress infringement. The Supreme Court, in dictum, has defined a functional feature as one that "is essential to the use or purpose of the article or [that] affects the cost or quality of the article." *Inwood Laboratories, Inc. v. Ives Laboratories,* 456 U.S. 844, 850, n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982). An essential feature is one dictated by the functions to be performed and is not simply accommodating. *Warner Bros., Inc. v. Gay Toys, Inc.,* 724 F.2d 327, 331 (2d Cir.1983). A feature affecting the cost or quality is one permitting the article to be manufactured at a lower cost. *Id.* The Second Circuit determined that the purpose of the defense was to encourage competition and the broadest dissemination of useful design features, and to protect such design advances from being monopolized. *Id.* at 331. *LeSportsac,* 754 F.2d 71 at 76.

■ Certain elements of the *People* cover format are purely functional as essential to the newsstand sales of celebrity personality and feature magazines to be displayed for sale in a manner such that a substantial portion of the cover may be obscured. Globe and others have used previous cover formats that contain either a secondary billing or an insert photograph without an objection from Time. In light of the Second Circuit's definition of a functional element, the secondary cover photograph and the secondary billing set off within a bar or a rule are both functional elements used to catch a purchaser's eye by putting information concerning the magazine's contents before a potential buyer.

However, looking at the individual elements of combining the magazine cover rather than the overall effect of a cover these specific elements is not the correct issue. *See, e.g. LeSportsac, Id.* at 76–77. It is the "combination of features as a whole rather than a difference in some of the details which must determine whether the competing product is likely to cause confusion in the minds of the public." *Perfect Fit Indus., Inc. v. Acme Quilting Co.,* 618 F.2d 950, 955 (2d Cir.1980). Time claims as its distinctive cover the particular combination and arrangement of the established elements, which is used to distinguish the magazine from a multitude of magazines at newsstands. As one unit, the *People* cover format, specifically containing the four previously mentioned elements, is not an essential cover format for the use of feature magazines sold at newsstands. While the elements of a secondary billing set off by a bar or a rule and the secondary inset photograph may be common and functional elements of the trade, the cover format when viewed in its entirety is not functional. *See Dallas Cowboys Cheerleaders Inc. v. Pussycat Cinema Ltd.,* 604 F.2d 200, 203 (2d Cir.1979); *LeSportsac,* 754 F.2d 71 at 76.

Further, there are numerous other cover formats from which *Celebrity* could chose. The fact that Time has uncovered no other feature magazine that uses the same cover format, indicates that this particular combination is not functional or necessary to compete for sale of such feature magazines. Protection of this cover format as a trade dress will not unduly hinder Globe's ability to compete for consumers of newsstand magazines.

### 2. Secondary Meaning

■ The trade dress of a product gains secondary meaning if the plaintiff establishes that the purchasing public associates that dress with goods from a single source rather than just the product itself. *Id.,* at 78; *Inwood,* 456 U.S. 844 at 851 n. 11, 102 S.Ct. 2182 at 2187 n. 11, 72 L.Ed.2d 606; *RJR Foods, Inc. v. White Rock Corp.,* 603 F.2d 1058, 1059–60 (2d Cir.1979). Evidence of plaintiff's extensive advertising and sales may be considered. *Id.*

However, Time has not presented one consistent *People* format which can be established as a trade dress with secondary meaning, despite Time's assertion in this

regard. Seven issues of *People* within the past two years do not contain an inset photograph in the right hand corner, six issues within the past year not containing either a photograph of a secondary billing and certain other issues lacking either element or positioning one of the elements differently within the *People* cover format. Although these cited issues do not constitute a majority of the issues *People* has published recently, they are sufficient to support a finding that Time has not established a trade dress that includes all these elements. Moreover, the trade dress claim with respect to the secondary billing and inset photograph is weakened by the finding that these elements are both functional and inconsistent elements of the cover format. The Time trade dress therefore does not include these elements.

■ While the magazine has published various covers without secondary billing, or without secondary photographs inset in the upper right corner, the *People* logo has remained virtually identical throughout its fifteen year existence. Time has consistently used the same type with a different colored border around that type and has displayed the letters of that type in a condensed fashion within the border. The fact that 67% of newsstand purchasers of *People* buy at least half of the issues published indicates that the consistency of the *People* cover format and Time's promotion thereof have generated a public recognition of the magazine upon which consumers rely in purchasing it.[1]

Further, sales of over 1 billion dollars and over 1 billion copies have been recorded in the last eight years. Time has spent over $47,500,000 on annual advertising over the last five years. This evidence in addition to the wide acceptance of the magazine identified by the *People* logo satisfies the secondary meaning requirement. *See RJR Foods*, 603 F.2d 1058 at 1059.

Moreover, a finding of intentional copying of the *People* cover format is further proof that the design has acquired secondary meaning. *Harlequin Enterprises Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 950 (2d Cir.1981). Given the almost identical format of the logo, consisting of seraph lettering, condensed letters and a different colored border around the lettering, and the recent adoption of the challenged trade dress and the absence of any other explanation, it has been established that Globe came as close as it possibly could to the *People* logo. The remarkable similarity of the two logos is probative of intentional copying. *Readers Digest Association, Inc. v. Conservative Digest, Inc.*, 821 F.2d 800 at 804 (D.C.Cir.1987).

Finally, in light of the prior *Celebrity* covers, which used an entirely different type, creating a very different cover format, one must ask why *Celebrity* changed its cover format to one that is virtually the same as that of *People*'s. As the Second Circuit stated in *Feathercombs Inc. v. Solo Products Corp.*:

> It is so easy for the honest businessman, who wishes to sell his goods upon their merits, to select from the entire material universe, which is before him, symbols, marks and coverings which *by no possibility* can cause confusion between his goods and those of [his] competitors and the courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them. (emphasis added).

306 F.2d 251, 257 (2d Cir.1962), *cert. denied*, 371 U.S. 910, 83 S.Ct. 253, 9 L.Ed.2d 170 (1962). In fact, the *Celebrity* logo is virtually indistinguishable from the *People* logo except for the different name, the star over the "i," the slight difference in breadth of the "e's" and the closure of that letter, and the extension of curlicues on the "l's". Such imitation warrants a finding of intentional copying of trade dress.

---

1. Globe points out that Wrestling Magazine ("*Wrestling*") has a cover format containing a logo that is equally similar to *People*'s as that of *Celebrity*. However, the similarities between the *Wrestling* cover format and *People*'s are not applicable here. *Wrestling* and *People* can readily be distinguished by their content and their readership market. There is therefore little likelihood of confusion as to the source of publication of the two magazines.

## New York Unfair Competition Claim

■ Under the *Harlequin* ruling, a secondary meaning is not a prerequisite to New York trade dress infringement claims where there is a finding of intentional copying of the trade dress. *Harlequin*, 644 F.2d 946 at 950; *see also Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 618 F.2d 950 (2d Cir.1980), *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982). Thus the deliberate imitation of *People*'s logo is sufficient to uphold the claim of trade infringement under New York law. *Harlequin*, 644 F.2d 946 at 950.

## Likelihood of Confusion

■ An action for trade dress infringement arises when a plaintiff alleges that a competitor's design or packaging is likely to confuse consumers as to the product source—such a design or packaging falsely designates its origin. *LeSportsac*, 754 F.2d 71 at 75. Having found that Time has a protectible trade dress, the next step in determining whether Globe should be enjoined from using its current cover format is to determine the likelihood of confusion among consumers as to *Celebrity's* source of publication. *See Toys R Us Inc. v. Canarsie Kiddie Shop Inc.*, 559 F.Supp. 1189, 1195 (E.D.N.Y.1983); citing *Mushroom Makers Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978) (*per curiam*), *cert. denied* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). The burden is on Globe to show the absence of such likelihood. *See Home Box Office v. Showtime/The Movie Channel*, 832 F.2d 1311, at 1314; *Perfect Fit Indus.*, 618 F.2d 950 at 953; *Harold F. Ritchie, Inc. v. Chesebrough-Pond's Inc.*, 281 F.2d 755, 758 (2d Cir.1960).

The Second Circuit has set forth factors in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir.1961), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), to be examined in making such a determination. The relevant factors in this case are:

(1) the strength and secondary meaning of the plaintiff's trade dress; (2) the similarity of the products and their dress; (3) the defendant's intent in effecting the challenged simulation; (4) the competitive proximity of the products; (5) the buying habits of their probable users; (6) and instances of actual confusion.

*RJR Foods*, 603 F.2d 1058 at 1061. These factors have been applied to trade dress infringement cases. *Id.*, at 1061; *see also Vitarroz v. Borden Inc.*, 644 F.2d 960, 965–66 (2d Cir.1981).

### 1. Strength of the People Cover Format

The strength of a trademark is "the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous source." *McGregor–Doniger Inc. v. Drizzle, Inc.* 599 F.2d 1126, 1131 (2d Cir.1979). Because the *People* cover format has acquired secondary meaning as discussed above, it is entitled to protection under the Lanham Act. The fact that the trade dress deserves protection goes to the strength of the mark. *Essence Communications, Inc. v. Singh Industries, Inc.*, 703 F.Supp. 261 (S.D.N.Y.1988).

Further, the evidence as to Time's advertising and promotion of this cover format is highly indicative of the public recognition of the *People* logo and cover format as a Time publication. *See Perfect Fit Indus.*, 618 F.2d 950 at 952–53. *See also Toys R Us*, 559 F.Supp. 1189 at 1197. This evidence as to the strength of the mark favors Time and thus supports a likelihood of confusion.

### 2. Similarity of the Products and Their Dress

Globe points to differences in the content, the targeted consumer market and the different names of the magazines to distinguish *Celebrity* from *People*. However, these differences are not sufficiently distinctive to overcome the similarities of the products. Both are feature magazines containing stories and photographs about celebrities. As Globe points out they are both sold primarily at newsstand sales and attract readers by the headlines and photographs contained on their covers. Further, the use of different names is not evidence

that there is no similarity of the products. *See Readers Digest*, 821 F.2d 800 at 805. The similarities of the two magazines surpass the differences Globe has noted.

Moreover, as discussed previously, it is the overall effect of the cover format that determines the similarities of these two magazines. There are differences, noted above, between the cover formats of the two magazines. *Celebrity*'s cover uses a different type "bold folio" which has a slightly narrower and closed "e", it has a star over the "i"; the Globe trademark is noted on the cover with the words "A Globe Publications". However, these differences also fail to dispel the overall impression of similarity. A brief look at the magazines, which both parties agree is all the consumers have time for before purchasing the magazine, will not reveal these differences. As the Second Circuit noted in *Harlequin*, "we ... are convinced that an ordinary buyer of romance fiction would not recognize the disparities without setting out to find them." It is no defense that the cover formats may be distinguishable in a side by side comparison by a consumer who it is presumed by the purchase can read. *RJR Foods Inc.*, 603 F.2d 1058 at 1060.

The type Globe uses is so similar in appearance that really only a professional or an extensive examination of the product would lead one to distinguish the types. Similarly, the artistic alteration of some of the letters, the "l's," and the star over the "i" do not sufficiently distinguish the type styles either. Thus, viewing the cover format of *People* as a whole, the trade dress of *People* and *Celebrity*'s cover format is very similar. *See also Sun–Fun Products Inc. v. Suntan Research & Development, Inc.*, 656 F.2d 186, 192 (5th Cir.1981).

3. Globe's Intent

As discussed above, the evidence indicates that Globe sought to come as close to the cover format of *People* as legally possible, thereby creating a presumption of likelihood of confusion. *See e.g. Harold F. Ritchie, Inc. v. Chesebrough–Pond's, Inc.*, 281 F.2d 755 at 759. Globe's efforts to change their May cover format fall short of dispelling this conclusion because those elements which constitute Time's trade dress have been maintained. As Judge Learned Hand stated in *American Chicle Co. v. Topps Chewing Gum, Inc.*:

> It is generally true that, as soon as we see that a second comer in a market has, for no reason that he can assign, plagiarized the "make-up" of an earlier comer, we need no more; for he at any rate thinks that any differentia he adds will not, or at least may not, prevent the diversion and we are content to accept his forecast that he is "likely" to succeed.

208 F.2d 560, 563 (2d Cir.1953). Thus the issue of intent weighs in favor of Time.

4. The Competitive Proximity of the Products

The proximity of the products are substantial and readily apparent. As discussed above, both are feature magazines with articles about celebrities that are sold in the same manner—through newsstand sales at grocery stores and supermarkets. The group of purchasers substantially overlap, both magazines are bought by women in their thirties. They are both magazines that are read for pleasure, and for obtaining information about current celebrities' personal lives. They are both published and are primarily distributed in the New York area. Both magazines are competitive in price, further increasing the possibility that consumers will not exercise careful selectivity by purchasers. *See RJR Foods Inc.*, 603 F.2d 1058 at 1061. Although *People* is a weekly publication, Time points out that concurrently with the weekly issues of *People*, they sell two or three special issues of the magazine each year with which the monthly *Celebrity* could easily be confused. This evidence supports the finding that the two magazines are quite proximate.

5. Buying Habits of the Purchasers

Time defines the consumers who purchase *People* as "impulse" shoppers, those who make a very quick decision to buy a magazine based upon the overall impres-

sion and visibility of the cover. This indicates that consumers only take the time to look for a cover they can recognize and one that indicates that information about persons in whom they might be interested is contained within. Again it is highly probable that consumers, looking at the *Celebrity* logo would think that it was a Time publication and in some way related to *People.*

### 6. Actual Confusion

 Time has not shown any evidence of actual confusion. However, evidence of actual confusion is not necessary for establishing a claim of likelihood of confusion. *Miles Shoes, Inc. v. R.H. Macy & Co., Inc.,* 199 F.2d 602, 603 (2d Cir.1952), *cert. denied,* 345 U.S. 909, 73 S.Ct. 650, 97 L.Ed. 1345 (1953); *LaTouraine Coffee Co. v. Lorraine Coffee Co.,* 157 F.2d 115, 117 (2d Cir.1946), *cert. denied,* 329 U.S. 771, 67 S.Ct. 189, 91 L.Ed. 663 (1946). Moreover, in light of the circumstances of this injunction, this is not fatal to Time's claim of trade dress infringement. Globe has published only one issue of *Celebrity* which was on the stands for only a short period of time before Time brought this action. Given the prior findings of likelihood of confusion, it is understandable that Time would not have been able to gather such information as of the start of this action.

For the reasons set forth above, Time has established a trade dress in the *People* cover format, the similarity of the *Celebrity* cover format, and that Globe's intentional imitation of *People*'s cover format in an effort to capitalize on their reputation and advertising. Further, the magazines are very close in competitive proximity, and the buying habits of consumers lead to a conclusion that there is a likelihood of confusion as to the source of publication of *Celebrity* magazine. Each of these factors weigh in Time's favor. It is fair to conclude therefore, that there is a likelihood that the public will be confused and that Time has proven its cause of action for the infringement of its trade dress.

### *Irreparable Injury*

As indicated earlier, to obtain a preliminary injunction, Time must establish that *Celebrity's* use of its cover format will cause irreparable injury. Where a party seeks a preliminary injunction in a trademark infringement case, irreparable harm is demonstrated by a showing of likelihood of confusion as to the source or sponsorship of the magazine. *Home Box Office v. Showtime/The Movie Channel,* 832 F.2d 1311, at 1314. Here Time has shown a likelihood of confusion sufficient to meet the showing of irreparable harm.

### *Balance of the Hardships*

Globe has printed 125,000 copies of the 1989 issue, approximately half of their regular level of production. However, they have only published one issue with the new cover and there are numerous other cover formats from which they could chose a new one. Further, given the finding of irreparable harm to Time and likelihood of confusion among consumers, allowing Globe to continue to use its current cover format could cause serious harm to Time. Therefore, the balance of hardships weigh in Time's favor.

### *Conclusion*

Time has established a trade dress in the *People* cover format which includes the condensed white lettering, and the display of the logo with a contrasting colored border. Globe has not shown that there is no likelihood of confusion, thus Time is likely to succeed on the merits of their claim of trademark infringement. Further, Time has shown that they will suffer irreparable harm if the injunction is not granted and that the balance of hardships tips in their favor. Further, For the reasons set forth above, Time's motion for a preliminary injunction is granted.

It is so ordered.