CLIFF'S NOTES, INC., Plaintiff,

v.

BANTAM DOUBLEDAY DELL
PUBLISHING GROUP, INC.,
Defendant.

No. 89 Civ. 4622 (SWK).

United States District Court,
S.D. New York.

Aug. 2, 1989.
As Amended Aug. 4, 1989.

Milgram Thomajan & Lee P.C. by William M. Hart, New York City (Bourke & Jacobs, P.C. by David A. Weinstein, Denver, Colo., of counsel), for plaintiff.

Patterson, Belknap, Webb & Tyler by Gregory Diskant and Barbara McCormick, New York City, and Bantam Doubleday Dell Pub. Group, Inc. by Harriette K. Dorsen and Kateherine Trager, for defendant.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

Plaintiff brings this action pursuant to § 43(a) of the Lanham Trademark Act, 15 U.S.C. § 1125, § 368–d of the New York General Business Law, and the common law of unfair competition. Presently before the Court is plaintiff's application for a preliminary injunction. Plaintiff Cliff's Notes, Inc. ("Cliff's"), which markets a line of study guides known as *Cliff's Notes,* contends that defendant's use of an imitation of Cliff's well-known book cover constitutes trademark infringement, trademark dilution, and unfair competition.

## BACKGROUND

Cliff's is known for its line of *Cliff's Notes* study guides sold as paperback booklets bearing the specific black and yellow cover design. In the period 1987 through 1988, Cliff's spent in excess of one million dollars annually to advertise and promote literary works sold under that design and, in the period of 1983 through 1986, spent well over one-half million dollars a year for advertising and promotional activities. Affidavit of J. Richard Spellman, ¶ 4. Cliff's sold more than eight million copies of their publication bearing the cover design in the last two years.

In August 1958, Cliff's began using the distinctive cover design for its publications, including study guides for students, manuals, and test preparation guides. The design consists of a particular layout of alternating yellow and black diagonal stripes arranged in combination with other graphic elements, including the design of a mountain and variations thereon. *Id.* at ¶ 2. Since August 12, 1986, the design has been registered on the Principal Register of the United States Patent and Trademark Office as trademark number 1,404,866 in class 16 (paper goods and printed matter). Exhibit 6, Affidavit of J. Richard Spellman. Cliff's extensive advertising and promotional efforts featuring its cover design coupled with the substantial sales of its publications has caused Cliff's design to become widely recognized by the public, as well as the trade, as identifying Cliff's as the source of publications which bear the unique cover design. Affidavit of J. Richard Spellman, at ¶ 7.

*Spy* is a monthly magazine published by Bantam Doubleday Dell Publishing Group, Inc. ("Doubleday") since the spring of 1986. Declaration of Kurt Andersen, at ¶ 1. *Spy*'s purpose is to provide political and social commentary in an entertaining manner through the use of journalism combined with humor, satire and parody. The magazine has an international circulation of 132,000, which is read by approximately 400,000 persons. *Id.* at ¶ 2.

In late 1988, *Spy* began the creation of *Spy Notes*, which is, according to the defendant, "a humorous book which parodies several popular urban novels of the 1980's." *Id.* at ¶ 5. Defendant admits that it "sought to evoke the look and feel of the *Cliff's Notes* cover by copying some of its prominent features such as the yellow and black diagonal stripes, the format and type style of the titles, and a picture of a clay model in the lower right corner." Declaration of Paul Bresnick, at ¶ 4. In fact, the cover of *Spy Notes* displays the trademarked yellow and black diagonal striped design as well as the features mentioned by Mr. Bresnick. Additionally, the inside format of *Spy Notes* is identical to *Cliff's Notes*'s format which categorizes its reviews of the books into the following sections: "list of characters", "prologue", "summary", "commentary", and "questions for review". Although *Spy Notes* contains the *Spy* Novel–O–Matic, there is nothing on this insert which indicates that either it or *Spy Notes* in its entirety is not published by, or in any way affiliated with *Cliff's Notes*.

## DISCUSSION

### Standard for Preliminary Injunction

A preliminary injunction may be granted only when the party seeking relief can make "a showing of (A) irreparable harm, and (B) either (1) likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir.1988); *Andy Warhol Enterprises, Inc. v. Time Inc.*, 700 F.Supp. 760, 763 (S.D.N.Y.1988) (citing *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979)).

The crucial issue in an action for trademark infringement or unfair competition is the likelihood that consumers may be confused as to the source or sponsorship of the items in question. *See Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 115 (2d Cir.1984), *cert. denied*, 479 U.S. 987, 107 S.Ct. 578, 93

L.Ed.2d 581 (1986). To establish the requisite level of confusion, plaintiff must show a " 'likelihood that an appreciable number of ordinary prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.' " *Andy Warhol Enterprises, supra,* 700 F.Supp. at 763 (quoting *Charles of the Ritz Group Ltd. v. Quality King Distr., Inc.,* 832 F.2d 1317, 1321 (2d Cir.1987)). Proof of such confusion also serves as additional evidence which can be used to establish the distinct finding that must be made with respect to plaintiff's likelihood of success on the merits. *See Church of Scientology Int'l v. Elmira Mission,* 794 F.2d 38, 41 (2d Cir.1986).

First Amendment Concerns

 Defendant contends that because *Spy Notes* is a parody it constitutes an artistic expression and is therefore afforded protection under the First Amendment. Parodies, as a form of political, social or artistic impression, generally enjoy the protections of the free speech clause of the first amendment. *See Hustler Magazine v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (parody of advertisement); *L. L. Bean. Inc. v. Drake Publishers, Inc.,* 811 F.2d 26, 34 (1st Cir.), *cert. denied,* 483 U.S. 1013, 107 S.Ct. 3254, 97 L.Ed.2d 753 (1987) (parody of L.L. Bean catalog); *Berlin v. E.C. Publications, Inc.,* 329 F.2d 541, 544 (2d Cir.), *cert. denied,* 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33 (1964) (parody of songs). Defendant argues that a trademark, "like any other familiar symbol in our society, is fair game for parody." Defendant's Memorandum at 20. While it is true that trademarks may be parodied, *see L.L. Bean, supra,* 811 F.2d at 33–34, the Court disagrees with defendant's general theory that the first amendment gives the parodist unbridled freedom to use a registered trademark as part of a parody or satire.

As the Second Circuit recently noted, "[a]n adjudication of trademark rights often involves a balancing of competing interests." *Silverman v. CBS, Inc.,* 870 F.2d 40, 48 (2d Cir.), *cert. denied,* —— U.S. ——,

109 S.Ct. 3219, 106 L.Ed.2d 569 (1989). The general proscription against use of another's trademark in commercial endeavors must be balanced with the need for free expression. "In the area of artistic speech, ... enforcement of trademark rights carries a risk of inhibiting free expression." *Id.* Even within the realm of free expression, the calculus is not simple. While overprotection of trademarks may inhibit expression, the protections offered by the trademark laws "contribute to a favorable climate for expression by complementing the economic incentive that copyright law provides to create and disseminate artistic works". *Id.* (citation omitted). It is this logic that lead the Second Circuit to state recently that "[b]ecause overextension of Lanham Act restrictions in the area of titles might intrude on First Amendment values, [the Court] must construe the Act narrowly to avoid ... a conflict". *Rogers v. Grimaldi,* 875 F.2d 994, 998 (2d Cir. 1989).

Defendant argues, based largely on *Rogers,* as well as on *L.L. Bean,* that likelihood of confusion is irrelevant since *Spy Notes* is a form of artistic expression. As a book or booklet, *Spy Notes* is unquestionably a form of artistic expression. At the same time, *Spy Notes* is intended to be sold, and is therefore simultaneously artistic and commercial. Such hybrid works, like movies, plays, books and songs, are subject to some government regulation since "the danger of consumer deception [remains] a legitimate concern." *Rogers, supra,* 875 F.2d at 997. While defendant stresses the need to protect artistic expression, noting that the parody in question here is not "a can of peas", the Second Circuit noted that "[p]oetic license is not without limits. The purchaser of a book, like the purchaser of a can of peas, has a right not to be misled as to the source of the product." *Id.* at 997–98.

Defendant contends that *Rogers* is dispositive of the specific facts of this case. The Court disagrees. The *Rogers* Court had to decide whether Ginger Rogers could prevent the use of the title "Ginger and Fred" for a fictional movie that only obliquely related to her and Fred Astaire.

The Court ultimately held that "the slight risk that such use of a celebrity's name might implicitly suggest endorsement or sponsorship to some people is outweighed by the danger of restricting artistic expression." *Id.* at 1000. The Court added that "[a]s to such titles, the consumer interest in avoiding deception is too slight to warrant application of the Lanham Act." *Id.* Thus, the issue in *Rogers* was whether "the title explicitly misleads as to the source or content of the work." *Id.* at 999. The Court ruled that titles which have "no artistic relevance to the underlying titles" or titles that have some artistic relevance but are explicitly misleading will "violate the Lanham Act." *Id.* at 999. The Court found that the title "Fred and Ginger" had artistic relevance to the content of the movie and was not explicitly misleading.

The Court seriously doubts whether the special balancing test enunciated in *Rogers* applies to the facts of this case. *Rogers* did not concern the use of a design, or trade dress, registered pursuant to the Lanham Act, but instead dealt with the specific area of titles of literary works. The Court refers consistently to the First Amendment protection afforded to "titles of artistic work." [1] Unlike the situation in *Rogers*, in which a famous personality sought to limit the potentially misleading use of her name, both plaintiff's and defendant's products here are artistic works. Plaintiff's *Cliff's Notes* are deserving of as much first amendment protection as are *Spy Notes*. "Indeed, it would be ironic if, in the name of the first amendment, courts did not recognize the right of authors to protect ... their creative work against infringement by others." *Rogers, supra,* 875 F.2d at 999. By its own terms, *Rogers* does not apply:

> This limiting construction [referring to the balancing test articulated] would not apply to misleading titles that are confusingly similar to other titles. The public interest in sparing consumers this type of confusion outweighs the slight

public interest in permitting authors to use such titles.

*Id.* at 999 n. 5. Thus, whether or not this purported parody is likely to confuse consumers remains an important concern. *Cf. Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.,* 828 F.2d 1482, 1486 (10th Cir.1987) ("Of course, a parody of an existing trademark can cause a likelihood of confusion. For example, where two marks are confusingly similar, ... a likelihood of confusion can exist despite the intent to parody.").

The *Rogers* decision concerned an appeal from this Court's granting of summary judgment to defendants. Since the discussion was not framed in terms of injunctive relief, the Court of Appeals was not concerned with "likelihood of confusion", the standard used in determining whether a preliminary injunction is appropriate. Thus, even if the *Rogers* balancing test were to be applied, it would have to be adapted to this procedural framework. If the *Rogers* standard were to apply, the Court would have to determine whether plaintiff is likely to succeed in proving that the use of its trademark in defendant's parody is explicitly misleading. Again, the Court would make a determination as to the likelihood of confusion, with an eye to determining whether the use is likely to be explicitly or seriously misleading.

Extension of *Rogers* to the instant case in the manner suggested by defendant would in effect create *per se* first amendment protection for any parody. The Second Circuit in *Rogers* specifically found that it would be inappropriate to hold the Lanham Act inapplicable to all titles that could be considered artistic expression. *Id.* at 999. Defendant argues that the cover design copied from Cliff's has artistic relevance to the underlying work since, as a parody, it must mimic the target sufficiently to call the target to mind. This argument suggests that any copying, no matter how blatant or confusing, should be protected from the reach of the Lanham Act because parody requires copying. The Court believes otherwise, and believes that

---

1. Judge Griesa, sitting by designation, expressed his doubts as well, noting "that this unique case would seem to be an inappropriate vehicle for fashioning a general rule of the kind announced by the majority." *Rogers, supra,* 875 F.2d at 1006 (Griesa, J., concurring).

the *Rogers* Court would agree. As the Second Circuit noted, "the Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression." *Id.* at 999. Consumer confusion is certainly part of the balance, and a parody is not exempt on the theory that the copy of a registered trademark is a necessary artistic element. Moreover, the *Rogers* Court decided that certain titles could be misleading, even though artistically relevant. Thus, it is essential for the Court to consider this factor.

Defendant's reliance on *L.L. Bean* and *Silverman*, for the proposition that the first amendment immunizes parody from the reaches of the trademark laws such that consumer confusion is not at issue, is misplaced. The Court does not disagree with the *L.L. Bean* court's conclusion that "[d]enying parodists the opportunity to poke fun at symbols and names ... would constitute a serious curtailment of a protected form of expression". *Bean, supra*, 811 F.2d at 34. That court, however, did not consider likelihood of confusion, not because the first amendment somehow makes that inquiry irrelevant, but because *L.L. Bean* involved an anti-dilution claim, not a trademark infringement claim. Moreover, *L.L. Bean* is distinguishable on the facts. In contrast to the instant case, the protected parody in *L.L. Bean* was "used for noncommercial purposes" as a section among many in a magazine. *Id.* at 32. The parody

> took up two pages in a one-hundred-page issue; neither the article nor [Bean's] trademark was featured on the front or back cover of the magazine. [The defendant] did not use Bean's mark to identify or promote goods or services to consumers; it never intended to market the 'products' displayed in the parody.

*Id.* Here, quite to the contrary, defendant features plaintiff's trademark on its cover and seeks to use that trademark for both commercial and non-commercial purposes; the trademark use here is co-extensive with defendant's product.

Defendant's argument that the Second Circuit's opinion in *Silverman* determines the outcome here is equally flawed. The issue in the *Silverman* Court's finding of an absence of a Lanham Act violation was the finding by the Second Circuit that the trademarks in question had been abandoned after twenty-one years of nonuse. *Silverman, supra*, 870 F.2d at 47. The Court noted that in addition to respondent's failure "to use its marks for more than 20 years", respondent had "no plans to resume [its] use in the reasonably foreseeable future." *Id.* The Court clearly stated that "[t]rademark protection is not lost simply because the allegedly infringing use is in connection with a work of artistic expression." *Id.* In accordance with the recent Second Circuit rulings, the Court holds that because of "[t]he interest of [Cliff's], and the public, in avoiding public confusion, an interest obviously entitled to weight in every trademark case," consideration of likelihood of confusion is required. *Silverman, supra*, 870 F.2d at 48.[2]

Likelihood of Confusion

The Second Circuit has enunciated several factors to consider in determining whether there is a likelihood of confusion:

> the strength of [plaintiff's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

*Warhol Enterprises, supra*, 700 F.Supp. at 763 (quoting *Polaroid Corp. v. Polarad*

---

**2.** The scope of *Rogers'* application to this case is not clear, just as the scope of the opinion itself is not clear. The *Rogers* Court rejected the analysis adopted in *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 206 (2d Cir.1979), in which the Court had held that the first amendment did not provide a

defense to trademark infringement claims unless there were no alternative avenues of communication available. At the same time, the Court of Appeals rejected this Court's determination that the first amendment provided an absolute defense, and instead opted for a balancing approach.

*Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961)). Consideration "of these *Polaroid* factors, none individually dispositive" serves to guide the Court in ultimately determining whether there is likelihood of confusion. *Banff, Ltd. v. Federated Dept. Stores, Inc.*, 841 F.2d 486, 490 (2d Cir.1988).

### 1. Strength of Plaintiff's Mark

█ The Second Circuit has defined the strength of the mark as " 'its tendency to identify the goods sold under the mark as emanating from a particular ... source.' " *Id.* at 491 (quoting *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979). This standard applies "even when the source is unknown to the consumer." *Centaur Communications v. A/S/M Communications*, 830 F.2d 1217, 1225 (2d Cir.1987). The *Centaur* Court held that in considering the strength of a mark "time and size of circulation and consumer identification are examined." *Id.* at 1226. Cliff's has been in circulation for over thirty years. This duration coupled with the "small market that does not require a large circulation base in order to acquire consumer identification ... together with [Cliff's] promotional activities," lead to the holding that "consumers in that ... market would associate the mark with its source." *Id.* at 1226. Cliff's mark is easily identifiable even at a distance. The mark is highly distinctive, and the Court finds that the mark is particularly strong.[3]

### 2. Similarity Between the Marks

█ In determining the similarity of the marks " 'the general impression conveyed to the purchasing public by the respective marks' is the pertinent inquiry." *Id.* (quoting *C.L.A.S.S. Promotions v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir.1985)). " 'Ultimately, the crucial question is whether the similarity is likely to create confusion.' " *Warhol Enterprises, supra*, 700

F.Supp. at 765 (quoting *Hasbro, supra*, 858 F.2d at 77). It is indisputable that but for a few changes, the *Spy Notes* cover is a virtual copy of the distinctive *Cliff's Notes* cover. The Second Circuit has held that "[w]hile there are some differences ... it is the 'combination of features as a whole rather than a difference in some of the details which must determine whether the competing product is likely to cause confusion in the mind of the public.' " *Harlequin Enterprises v. G & W Corporation*, 644 F.2d 946, 950 (2d Cir.1981) (quoting *Perfect Fit Industries v. Acme*, 618 F.2d 950, 954 (2d Cir.1980)). Under this standard, the Court concludes that defendant's use of the *Spy Notes* current cover design and plaintiff's use of its trademarked cover design are similar to a degree that would cause consumer confusion. *Spy Notes'* cover evokes an immediate association with Cliff's study guides. Defendant does not dispute that the design of the *Cliff's Notes* is particularly "prominent", and even conceded that it copied it, in part, for that very reason. Declaration of Paul Bresnick at ¶ 4.

### 3. Competitive Proximity of the Products

█ The Second Circuit has held that "[p]roducts which directly compete in the marketplace clearly warrant a finding of the highest degree of competitive proximity." *Hasbro, supra*, 858 F.2d at 77. In the instant case, "[t]he two products are in the same general medium", books, *Warhol Enterprises, supra*, 700 F.Supp. at 765, and they are "sold in the same manner", in bookstores. *Time Inc. v. Globe Communication*, 712 F.Supp. 1103, 1110, 10 U.S.P. Q.2d 1915, 1921 (S.D.N.Y.1989), and thus have a level of competitive proximity. The books may not "compete for the same reading public", since people wishing to buy study guides would probably not be in need of the guides for the books parodied in *Spy*

---

**3.** Using the categories developed in *Abercrombie & Fitch v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976), in which marks are identified as generic, descriptive, suggestive, or arbitrary, it would appear that the Cliff's cover design is arbitrary since the design bears no relationship to the contents. This test is not determinative, and is usually used in reference to unregistered terms. *See Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir.1988). Nonetheless, it is instructive here.

*Notes. Id.* 712 F.Supp. at 1110–11, 10 U.S. P.Q.2d at 1921. At the same time, however, defendant makes it clear that *Spy Notes* are aimed at a college audience familiar with both the design and structure of *Cliff's Notes.* This factor thus also weighs in favor of a finding of likely confusion.

#### 4. *Likelihood that the Prior Owner will Bridge the Gap*

■ "The likelihood that the senior user of the mark will bridge the gap by entering the market in which the junior user operates," *Hasbro, supra,* 858 F.2d at 78, is the fourth *Polaroid* factor. In the instant case there is only a narrow gap to bridge since "the goods, and the use of the mark, are ... [virtually] identical." *Warhol Enterprises, supra,* 700 F.Supp. at 766. Even if defendant argues that *Spy Notes'* satire is a different product than *Cliff's Notes,* defendant's publication, specifically the trademarked cover design, will in all likelihood cause *Spy Notes* to be perceived by the consumer as *Cliff's Notes* satire of the three novels listed on its cover, or possibly, as a satire of Spy Magazine. Therefore, this factor weighs on the side of plaintiff.

#### 5. *Actual Confusion*

■ Plaintiff need not show actual confusion in order to prevail on its claim. *Hasbro, supra,* 858 F.2d at 78; *Banff, Ltd. v. Federated Dept. Stores, Inc.,* 841 F.2d 486, 492 (2d Cir.1988). It is impossible at this point for plaintiff to be able to offer such proof since defendant's product has not yet been put on the market. Thus, establishing the other *Polaroid* factors, with a showing of likelihood of consumer confusion, is sufficient.

#### 6. *Bad Faith*

■ "The sixth *Polaroid* factor [is] the junior user's bad faith *vel non* in adopting the mark." *Hasbro, supra,* 858 F.2d at 78. While defendant does not deny its intentional copying of plaintiff's trademarked cover design, it did so with good faith in its attempt at parodying *Cliff's Notes.* An intent to parody is not an intent to confuse,

and in fact, is just the opposite. *Universal City Studios v. T–Shirt Gallery, Ltd.,* 634 F.Supp. 1468, 1478 n. 14 (S.D.N.Y.1986) (citing *Nintendo, supra,* 746 F.2d at 116). Therefore, in the absence of bad faith, "this factor [would normally weigh] neither in favor nor against a finding of likelihood of confusion." *Warhol Enterprises, supra,* 700 F.Supp. at 766.

The Court has some question, however, as to whether or not the *Spy Notes* actually qualify as a parody. Courts in other districts have viewed a defendant's parody arguments, not as a separate defense, but as an argument that consumers are not likely to be confused. *See Mutual of Omaha Ins. Co. v. Novak,* 648 F.Supp. 905, 910 (D.Neb.1986), *aff'd,* 836 F.2d 397 (8th Cir.1987), *cert. denied,* — U.S. —, 109 S.Ct. 326, 102 L.Ed.2d 344 (1988); *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.,* 625 F.Supp. 48, 55 (D.N.M.1985), *aff'd,* 828 F.2d 1482 (10th Cir.1987). The parties agree that any parody requires some degree of copying, but plaintiff argues, and the Court agrees, that there is some limit to permissible use of another's trademark. "While a parody must call to mind the actual product to be successful, the same success also necessarily distinguishes the parody from the actual product." *Mutual of Omaha Ins. Co., supra,* 648 F.Supp. at 910 (citing 2 J. McCarthy, *Trademarks and Unfair Competition,* § 31.38 (2d ed. 1984)). Defendant's witness, Tony Hendra, explains that the parodist must copy the target while simultaneously distinguishing the parody from the target so that the parody will have the look and feel of the target while yet being distinguishable from it. A product that clearly parodies another will dispel any possible consumer confusion. *Nintendo, supra,* 746 F.2d at 116 ("the fact that Donkey Kong so obviously parodies the King Kong theme strongly contributes to dispelling confusion on the part of consumers").

Defendant enclosed in its papers numerous examples of parodies of magazines, newspapers and books that it claims establish the acceptability of its own purported parody. Yet, quite to the contrary, the

Court finds that these examples are each distinguishable in crucial ways from *Spy Notes*. Plaintiff argues that *Spy Notes* goes far beyond "conjuring up" the *Cliff's Notes* image, and instead merely copies it with minor differences added in an attempt to avoid trademark violations. The Court agrees with this conclusion. The evidence presented to the Court indicates to the highest degree of certainty that defendant intentionally copied the Cliff's cover and did so with an eye to promoting its own product. Defendant rejected a variety of other designs that might have conjured up the Cliff's image without copying the exact color, pattern of stripes, and type style. Unlike the examples of parodies included in defendant's submissions, *Spy Notes* does not involve either a visual gag or a play on the Cliff's name or cover design. For example, the Harvard Lampoon's parody of J.R.R. Tolkien's *Lord of the Rings* is entitled *Bored of the Rings*, and immediately indicates on the cover that it is a parody. Similarly, the National Lampoon's *The Job of Sex*, while conjuring up the targeted *The Joy of Sex*, leaves no doubt that the book is a parody. The magazine and newspaper parodies similarly involve a play on the target's name: "Sports Hallucinated", "Like a Rolling Stone", "Rolling Tombstone", "Not the New York Times", "Off the Wall Street Journal" and the "Irrational Inquirer". Other parodies involve using the actual name of the magazine, with a bold indication across the cover that it is a parody, and some visual indication that this issue is irregular.[4] Defendant considered a number of other designs and layouts, attached as Exhibit 29. Without deciding whether or not any of these designs would be permissible, the Court notes that they are much closer to the mark.

Defendant argues that the cover of *Spy Notes* clearly indicates that it is not associated with plaintiff because it states it is a satire, says "Spy Notes" in red letters, adapts the clay mountain design on the cover of *Cliff's Notes* to that of a city, and includes a patch indicating that the book

contains the "Spy Novel–O–Matic". Yet, even with all these changes from the standard Cliff's cover, it is not clear what is being satirized. While defendant argues that it is satirizing both Cliff's and the books, a consumer might reasonably conclude that only the books are being satirized, or that Cliff's is satirizing Spy. The fine print disclaimer on the back of the title page is not sufficient. *See Home Box Office v. Showtime*, 832 F.2d 1311, 1315 (2d Cir.1987) (questioning general ability of disclaimers to reduce consumer confusion adequately). The use of the SPY name also does not in and of itself reduce consumer confusion, since consumers could believe that Cliff's was satirizing Spy, that Spy was a division of Cliff's or that Cliff's licensed Spy. The use of the distinctive Cliff's design will certainly lead consumers to believe that Cliff's is somehow associated with this product.

### 7. *Quality of the Junior User's Product*

Plaintiff's central argument concerning this factor is that no matter how good defendant's product turns out to be, to the extent that consumers are misled by defendant's copy of plaintiff's cover into purchasing defendant's book in the mistaken belief that it is an accurate summary of the novels listed on its cover, consumers will be dissatisfied and attribute such dissatisfaction to Cliff's. The Court believes that the possibility of this repeated occurrence is significantly increased by the text on the back cover of *Spy Notes* which gives the misleading impression that the book does, in fact, contain accurate summaries of and commentary upon the novels listed on its cover. Even if a consumer bought *Spy Notes* with full recognition that it is a satire, the " 'lack of marked difference between goods supports the inference that they emanate from the same source.' " *Id.* at 767 (quoting *Centaur Communications, supra*, 830 F.2d at 1228). Therefore, any belief by a consumer that the satire is

---

**4.** As might be imagined, the covers are often off-color or are highly satirical. The headline of the Lampoon's *Time* cover, for example, reads: "The President's Brain is Missing", below which is a caricature drawing of President Reagan with his head open at the top.

affiliated with Cliff's weighs heavily toward plaintiff's argument of likelihood of confusion.

#### 8. *Sophistication of the Buyers*

 The Second Circuit has held that "unsophisticated consumers aggravate the likelihood of confusion." *Hasbro, supra,* 858 F.2d at 79. The *Hasbro* Court ruled that "[t]his is especially true when the ... products' marks are similar and the [products are] inexpensive." *Id.* Defendant contends that the consumers whom it targets are sophisticated to a degree which would enable them to distinguish between its product and Cliff's. Even if this were an accurate assumption, "[t]he Court is not in a position to guess about the ... sophistication" of the consumers whom Cliff's targets, those who are in need of study guides. *Warhol Enterprises, supra,* 700 F.Supp. at 767. However, the similarity of the book covers and the inner format leads this Court to believe that the average consumer would associate them with the same publisher, namely, Cliff's. The belief warrants a finding that this factor weighs in favor of finding a likelihood of confusion. *Id.*

 In considering the eight *Polaroid* factors, and defendant's parody arguments, the Court is of the opinion that there exists a very strong likelihood of confusion should defendant be allowed to market its goods as they currently appear. For the purposes of trademark and unfair competition law, plaintiff has established a likelihood of success on the merits. Even adopting the standard used by the *Rogers* Court, the Court finds that plaintiff has met its burden. The cover, which is not clearly a parody and which is likely to confuse consumers, is seriously or explicitly misleading. A cover that sends the message, "This is a Cliff's Notes product", explicitly sends the message that Cliff's endorsed the product, and this message brings *Spy Notes* within the purview of the Lanham Act.

Having found a profound likelihood of confusion, the Court also finds that plaintiff will be irreparably harmed unless defendant's marketing of *Spy Notes* is enjoined. The Second Circuit has held that, in trademark cases, "establishing a high probability of confusion almost inevitably establishes irreparable harm." *Church of Scientology Int'l, supra,* 794 F.2d at 41. With the confusion that is likely, plaintiff's good will stands to suffer.

Although the Court need decide whether there are sufficiently serious questions going to the merits and a balance of hardships tilting decidedly in plaintiff's favor, the Court would so conclude on this record. The Court does not reach plaintiff's anti-dilution claim, but only notes that the analysis would be markedly different since consumer confusion is generally not an issue. As such, the first amendment protections would likely weigh more heavily in defendant's favor, as also appears to be the case in copyright cases. *L.L. Bean, supra,* 811 F.2d at 33 (anti-dilution); *Warner Bros. v. American Broadcasting Co.,* 720 F.2d 231, 242 (2d Cir.1983) (copyright).

### CONCLUSION and ORDER

Based on the Court finding that Cliff's has demonstrated irreparable injury and a substantial likelihood of success on the merits, the Court grants a preliminary injunction enjoining Doubleday from distributing *Spy Notes* with its current cover design. Accordingly, it is hereby

ORDERED that defendant Bantam Doubleday Dell Publishing Group, Inc., and all others acting in concert with it, pending final trial herein or further order of this Court, are preliminarily enjoined from utilizing, in connection with promotion, distribution, sale, exploitation of publications or related products, or further manufacture of plaintiff's cover design as depicted in Exhibit 1 of the Affidavit of J. Richard Spellman (attached hereto as Appendix A), or any other colorable copy likely to be confused with plaintiff's cover design, such as the design attached as Exhibit 14 to the Affidavit of J. Richard Spellman (attached hereto as Appendix B); and it is further ORDERED that defendant shall forthwith provide written notice to all customers from whom any orders were solicited

or received for publication bearing the cover designs described in the above paragraph; and it is further

ORDERED that the parties confer and stipulate to the form of the written notice to be sent to customers; and it is further

ORDERED that plaintiff shall post a bond in the amount of $100,000, pending final determination or further order of the Court.

In addition, defendant has written the Court requesting that the Court stay its injunction pending an expidited appeal. The Court denies this request.

SO ORDERED.

APPENDIX B

A SATIRE A SATIRE A SATIRE A SATIRE A SATIRE A SATIRE

**SPY NOTES On**

$7.95

SPY BOOK

## McINERNEY'S BRIGHT LIGHTS, BIG CITY

## JANOWITZ'S SLAVES OF NEW YORK

## ELLIS'S LESS THAN ZERO

### ...AND ALL THOSE OTHER HIP URBAN NOVELS OF THE 1980s

INCLUDES THE SPY NOVEL-O-MATIC FICTION-WRITING DEVICE!

SPY NOTES

EVEN FUNNIER THAN THE ORIGINALS

A SATIRE

American Dad
Brest of Phoebe
Bright Lights, Big City
Brown of the Systems
Created in Education
From Roadway
Higher Education

Highlights of the
Oil-Seizure
Less Than Zero
Lives of the Saints
Mondays
Mysteries of Pittsburgh
Outside Providence

Ransom
Rules of Attraction
Sad Movies
Slaves of New York
Story of My Life
Summber
Velocity

### You're not the kind of person who would be reading books like these.

From the drug abuse, sexual convulsions and/or adolescent angst in the nightclubs of *Bright Lights, Big City* to the drug abuse, sexual convulsions and/or adolescent angst in the dorm rooms of *The Rules of Attraction*, *SPY NOTES* puts these easy-to-read books into an even easier-to-read format. The plots have been distilled into easily digestible, non-time-consuming SUMMARIZATIONS. All metaphors, symbols and stylistic devices are explained in easily comprehensible, intellectually unchallenging COMMENTS.

*SPY NOTES* will enlighten those in search of pop cultural literacy, amuse the skeptical and astonish the naive.

Special *SPY NOTES* appendices include:
o The revolutionary NOVEL-O-MATIC™ fiction-writing device
o From inspiration to marketable product: a flow chart of how these books are created
o Biographies of the authors
o A simulated rap session with the authors
o A master genre-in-a-nutshell comparison chart

*SPY NOTES:* An indispensable guide to the books everyone talks about and some people even read.

### THE CRITICS SPEAK!

"These books are so indifferent to the most basic requirements of fiction writing that any attempt to apply the usual criteria of judgment leaves a reader feeling foolish, irrelevant, dull-witted."
Terrence Rafferty, *The New Yorker*

(continued on inside back cover)

5 0795

9 780385 247450

N 0-385-24745-1>>795

U.S. $7.95
CAN. $9.95
HUMOR
0000

A DOUBLEDAY/DOLPHIN BOOK